**1:07cv176**

# Large Pleading

COMPLAINT

*exhibits not scanned –
available for viewing
in Clerk's Office*

**1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

MOUNTAIN AREA REALTY, INC.,　　　　)
2788-B Rockfish Valley Highway　　　　)
Nellysford, VA 22958　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Civil Action No. _1:07CV176_
　　v.　　　　　　　　　　　　　　　)　　_CMH / TCB_
　　　　　　　　　　　　　　　　　　)
WINTERGREEN PARTNERS, INC.　　　　)
Mountain Inn, Devil's Knob　　　　　　)
Wintergreen Resort, VA 22958　　　　　)　　(JURY TRIAL DEMANDED)
　　　　　　　　　　　　　　　　　　)
Serve:　　　　　　　　　　　　　　　)
Registered Agent　　　　　　　　　　)
Daniel F. Schabein　　　　　　　　　　)
Wintergreen Partners, Inc.　　　　　　)
P.O. Box 706　　　　　　　　　　　　)
Wintergreen, VA 22958　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
ROY WHEELER REALTY Co.,　　　　　)
1100 Dryden Lane　　　　　　　　　　)
Charlottesville, VA 22903　　　　　　　)
　　　　　　　　　　　　　　　　　　)
Serve:　　　　　　　　　　　　　　　)
Registered Agent　　　　　　　　　　)
Richard E. Carter　　　　　　　　　　)
414 Park Street　　　　　　　　　　　)
Charlottesville, PA 22902　　　　　　　)
　　　　　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
ROBERT S. ASHTON　　　　　　　　　)
472 Cedar Meadow Drive　　　　　　　)
Nellysford, VA 22958-8064　　　　　　)
　　　　　　　　　　　　　　　　　　)
LLOYD W. WILLIAMS　　　　　　　　)
Mountain Inn　　　　　　　　　　　　)
Devil's Knob　　　　　　　　　　　　)
Wintergreen Resort, VA 22958　　　　　)
　　　　　　　　　　　　　　　　　　)
and　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
LELAND S. KOLLMORGEN　　　　　　)
105 Saddleback Knoll　　　　　　　　　
Nellysford, VA 22958　　　　　　　　
　　　　　　　Defendants.　　　　　　)



## COMPLAINT

1.    Plaintiff Mountain Area Realty, Inc. ("MAR") brings this action against Wintergreen Partners, Inc., a Virginia non-stock corporation ("WPI"), Roy Wheeler Realty Co., a Virginia corporation ("RWRE"), Robert S. Ashton ("Ashton"), Lloyd W. Williams ("Williams") and Leland S. Kollmorgen ("Kollmorgen") (together, the "Individual Defendants") for violations of the Sherman Antitrust Act, common law fraud, violations of the Virginia Antitrust and Consumer Protection Acts and conspiracy. Plaintiff is seeking damages and injunctive relief from WPI resulting from two exclusive dealing contracts.  The first was with Wintergreen Real Estate Company ("WREC") which ran from 1999-2005.  WREC has acknowledged the anticompetitive effects of the exclusive dealing contracts and is now urging WPI to cease using them; accordingly, MAR has not now named WREC as a defendant in this action.   The second exclusive dealing agreement is with RWRE which started in September, 2006 and is still in effect. MAR is seeking damages and injunctive relief against RWRE as well as against WPI


## SUMMARY


2.    As set forth in more detail below, WPI, a non-stock membership corporation doing business as a club, owns and operates the resort, recreational, retail, conference and restaurant facilities in Wintergreen Resort, Nelson County, Virginia. In 1999, WPI entered into a written exclusive-dealing agreement with WREC and High Country Associates, LLC ("HCA"), a Delaware limited liability company, which gave WREC the exclusive right to have a real estate sales office in Wintergreen Resort in

return for WREC's and HCA's selling, annually, $400,000 worth of memberships in WPI at prices which WPI maintained at supracompetitive levels (the "First Exclusive Agreement" or the "Agreement"). [1] *See* Exhibit 1 attached hereto. It was WPI's, WREC's and HCA's intention, through this illegal exclusive-dealing Agreement, to restrain competition for the resales of Resort properties to the detriment of consumers and the market as a whole.

3.    Because of the illegal exclusive-dealing agreements, competition has been restrained by the exclusion of rivals. From 1999 until 2005, WREC was consistently able to foreclose from completion more than two-thirds of the resales of Wintergreen Resort properties and to increase its share of all resales in Nelson County to 61%. Resort property sales account for approximately 78% of the value of all sales in the county (computed over the last four years). As a result of the current exclusive dealing agreement, RWRE, operating as Wintergreen Resort Premier Properties ("WRPP") has, in WPI's words, "first dibs" on all potential purchasers of Resort resale properties and has, in less than six months, surpassed all real estate firms in Nelson County in numbers of agents and potential purchasers.

4.    The First illegal Exclusive-dealing Agreement harmed consumers by enabling WREC to exercise market power and charge supracompetitive listing and sales commissions. In particular, WREC was able to charge a 6 - 7% commission on homes and condominiums and a 10% commission on land, while the competitive market commission rates were 5-5 ½% on homes and condominiums and 6-8% on land.

---

[1]    At no time did WPI or WREC reveal their mutual interest in either the real estate office or the sale of memberships. WREC's failure to reveal these interests violates the Realtor Code of Ethics and the regulations of the Virginia Department of Professional and Occupational Regulations. ***Code of Ethics and***

5.     WREC's market power derived from the illegal exclusive-dealing Agreement also allowed it to withhold standard real estate services for resale properties, such as regular open houses, extensive advertising of resale properties in newspapers and real estate publications and professionally designed sales brochures.

6.     From WPI's point of view, the two illegal exclusive-dealing agreements have allowed WPI to maintain supracompetitive prices for memberships and annual fees and a supracompetitive 50% commission on the rental of Resort properties owned by others, while the competitive market commission was 25%. In order to have a viable Resort rental program, a real estate agent must be able to deliver the keys to the rental unit (and other Resort information) to the renter in a convenient way. Because the illegal exclusive-dealing Agreement excluded all other real estate agents from the Resort except WREC, only WREC was in a position to have a viable program in competition with WPI. By agreement, express or tacit, WREC did not compete with WPI in the rental of Resort properties, thereby assuring WPI of market power in that market.

7.     On or about October 31, 2005, WPI terminated WREC's illegal exclusive rights. For 2006, WREC's market share of real estate resales at the Resort plummeted from 65% to 45% and its market share of resales in Nelson County dropped from 52% to 31%.[2] Both of these percentages are continuing to drop. WREC's current share of listings is now only 29% and falling. As is described more fully below, the only explanation of these precipitous declines is WREC's loss of its exclusive agreement.

*Standards of Practice*, Preamble, Articles 1, 2, 6, 7, 11, and 12 (2006); 18 VAC §§ 135-20-260(10) and (11); 135-20-300(4).
[2]     WREC lost its office in Mountain Inn on October 31, 2005 but it did not lose its exclusive right to have an office on Resort property until September 1, 2006. Moreover, after WREC lost its office in Mountain Inn, the WPI personnel at the Reception desk would refer real estate inquiries to WREC at the Bear House model home owned and maintained by WREC about 1400 yards down the access road from

8.     On August 31, 2006, WPI announced that, in return for a "cut" of the

profits and other anticompetitive benefits, it had entered into another illegal exclusive

dealing agreement with regard to a real estate sales office in Wintergreen Resort, this

time with RWRE, operating under the name of WRPP. ("the Second Exclusive

Agreement").  WPI trumpeted that this exclusive deal gave RWRE the "only real estate

office" on Resort properties, "the exclusive rights to advertise on the resort website," the

exclusive right to display real estate literature of any kind in the Resort, and "first dibs on

potential clients visiting the resort."  It advised buyers and sellers that dealing with the

"only official real estate firm of Wintergreen Resort" would give them the "advantages of

being *on the inside*" (emphasis in the original).  Indeed, the Second illegal Exclusive

Agreement is even more exclusionary than the First Exclusive Agreement in that it

precludes any other real estate firm from being listed on the Resort web site or from

having brochures or other materials on Resort property.

9.     In less than six months since the announcement and the opening of the

RWRE office in the Resort, RWRE has gained a virtual monopoly on new, potential

purchasers of Wintergreen properties and is actively soliciting agents from other firms,

including MAR. Several realtors associated with competing firms have already left their

firms to join WRPP.  Most  telling, of the five firms other than RWRE which provide any

significant real estate services in the Resort, three have closed, or are in the process of

closing, their Nelson County offices serving the Resort because they cannot compete with

the RWRE monopoly.

---

Mountain Inn. Thus, its market share in a competitive market, without either of the principal benefits of the
illegal exclusive dealing Agreement, cannot yet be known but most certainly will be significantly lower.

10.    As a result of the anticompetitive foreclosure effected by the First

Exclusive-dealing Agreement, MAR has suffered losses of nearly $6,000,000.[3] The

anticompetitive foreclosure has also has caused extensive harm to consumers who have

paid and are paying higher commissions and who have received reduced services because

of the reduction in competition.   In addition, purchasers of real estate have been and are

being coerced to purchase memberships in WPI.

11.    For the reasons set forth herein, the Second Exclusive-dealing Agreement

will cause even greater consumer and competitive harm. Indeed, numerous property

owners at the Resort have taken it upon themselves personally to express their opposition

to the illegal Second Exclusive-dealing Agreement.  In addition, a petition, describing the

illegal and anticompetitive effects of the Agreement and the Second Exclusive

Agreement, has been circulated among them and nearly 1,000 have signed the petition,

many of whom have appended personal comments objecting to the harm to consumers

and to the market caused by the Agreement and the Second Agreement. *See* composite

Exhibit 2, attached hereto.  Because of the market power created by the exclusive-dealing

Agreements, however, those property owners remain locked-in to WRPP as a practical

matter.

12.    At no time has WPI articulated any procompetitive justification for or

benefit from its exclusive-dealing agreements.[4]   Coercing buyers to pay

supracompetitive prices for WPI memberships is not a procompetitive benefit.  Nor is

---

[3]        These damages are computed only for 2003-6; the actual damage to MAR since the inception of
the illegal Agreement is substantially higher.
[4]        The only excuse that WPI and RWRE or WRPP have been able to offer is that they "have levelled
the playing field."  To the contrary, as WPI openly advertises, the illegal Agreements have resulted in one
firm (first WREC and, now, WRPP) having "first dibs" on every potential purchaser of Resort property.
Sellers, who are keen market observers, see this monopoly on potential purchasers and list their property

extracting supracompetitive prices for rental services. Although, in theory, WPI should act for the benefit of its members who are property owners, agency effects have caused WPI to act in a manner contrary to the interests of Wintergreen property owners. Moreover, as a practical matter, injured property owners who are members of WPI have no effective remedy within WPI. Most sellers who have paid higher commissions and received reduced real estate services are, by definition, no longer members of WPI and, therefore, could have no remedy within the organization.

## JURISDICTION AND VENUE

13.     MAR's complaint arises under the antitrust laws of the United States, 15 U.S.C. §§ 1, 2, 15, 26, and the common and statutory law of Virginia. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367 and 15 U.S.C. §§ 1, 2, 15, and 26.

14.     Venue is proper pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d).

15.     Defendants advertise in, send marketing materials and agents into, transact business in interstate commerce and are found within this judicial district. MAR's claims arise in part within this district, and Defendants' unlawful conduct has harmed commerce in this district. The interstate trade and commerce described herein is and has been carried out in part within this district.

---

with the exclusive firm (*see* paragraph 30, *infra*). As a result, it is especially disingenuous to say that this is a "level playing field."

## PARTIES

16.     Plaintiff MAR is a Virginia corporation with its principal place of business at 2788-B Rockfish Valley Highway, Nellysford, Nelson County, Virginia 22958.  MAR provides real estate services, including resale services for homes, condominiums, lots and raw land, in Nelson County, Virginia, and attempts to provide such services in Wintergreen Resort.

17.     Defendant WPI is a non-stock Virginia corporation with its principal place of business at Mountain Inn, Devil's Knob, Wintergreen Resort, Virginia 22958.

18.     Defendant RWRE is a Virginia corporation with its principal place of business at 1100 Dryden Lane, Charlottesville, Virginia 22903.

19.     Defendant Ashton is a citizen and resident of Wintergreen Resort, Nelson County, Virginia, and is, and has been during all material times, the President and chief executive officer of WPI.  Ashton was the ultimate controlling actor who designed, negotiated and executed the illegal agreements and is personally liable for all the damages suffered thereby.  Defendant Ashton maintains an office in the WPI offices in Mountain Inn.

20.     Defendant Williams is the Vice President-Marketing of WPI.  Defendant Kollmorgen was the Chairman of the Board of Directors of WPI.  As to the Second illegal Exclusive-dealing Agreement between WPI and RWRE, Williams and Kollmorgen were, along with Ashton, controlling actors who designed and negotiated the illegal agreement, and who, along with Ashton, signed a letter to MAR and other realtors announcing the Second Exclusive Agreement and barring MAR's marketing materials from Resort property. *See* Exhibit 3 attached hereto. Williams and Kollmorgen are

personally liable for all the damages suffered thereby. Defendant Williams maintains an office in the WPI offices in Mountain Inn. Defendant Kollmorgen resides at 105 Saddleback Knoll, Nellysford, VA 22958.

21.    On information and belief, the Individual Defendants have personally benefited from the illegal agreements by advancement in corporate office, increased compensation (which in one or more cases is well in excess of that paid by comparable resorts for comparable service) and/or personal perquisites or benefits.

## FACTS

## Background

22.    In 1974, a group of Virginia investors conceived of a family oriented, four seasons, golf, skiing and vacation resort in Nelson County in the mountains of central Virginia. Operating under a succession of entities which ultimately became Wintergreen Development, Inc. ("WDI")[5], they purchased property which now comprises approximately 11,000 acres on Devil's Knob Mountain, Black Rock Mountain and Crawford's Knob, and in Nellysford in the valley below. They permanently dedicated approximately 5000 acres, mostly on Crawford's Knob, as open space, and proceeded to build ski slopes (ultimately 23) , golf courses (ultimately 45 holes), tennis courts and other recreational amenities and to develop the remaining property into lots (approximately 2425) for single family homes and tracts for condominiums and townhomes (approximately 1180), installing roads, water and sewer and electric service and facilities for police and fire protection.

---

[5]    For convenience, the entire chain of entities which successively owned the Resort is referred to throughout as WDI.

23.     WDI built a commercial center in the mountaintop resort called "Mountain Inn," where non-property owning visitors to the Resort check in at a Reception desk, and maintained an Orientation Center across from the Reception desk.  Mountain Inn is the gateway to all the ski slopes, shops, conference facilities, rental properties and restaurants of the Resort.  WDI's in-house sales agents[6] had an office in Mountain Inn but that building also contains approximately 40,000 sq. ft. of commercial and conference space, much of which is leased to unrelated tenants or is vacant and would be appropriate for competitive real estate offices.

24.     All amenities and facilities at the Resort are, and always have been, open to the public.  Approximately 100,000 - 190,000 non-property owning visitors use the Resort each year (depending on the quality of the ski season). Visitors to the Resort are, by far, the principal source of sales "leads," and ultimately consummated real estate transactions, with regard to resales of Resort property.  After the  First Exclusive Agreement went into effect, WPI personnel at the reception desk uniformly referred all real estate inquiries to the WREC office across from the Reception desk.In 1984, a group of investors purchased the Resort recreational and commercial properties and other amenities, including Mountain Inn, through WPI.  WDI retained, and continued to sell, the Resort development properties.[7]

---

[6]     WDI's in house sales department was known as Wintergreen Real Estate Co.  As set forth below, when WREC was formed in 1999, it took the name of that unincorporated division of WDI and, pursuant to the First Exclusive Agreement, occupied the Orientation Center as its sales office.

[7]     By the late 1990's, the development properties were substantially "sold out" and declining sales and mismanagement caused WDI to seek bankruptcy protection. In 1999, the Bank, which was the largest and only significant secured creditor of WDI, sold the remaining developable property to High Country Associates, LLC ("HCA") which was 80% owned by four of the then-existing sales agents of the Wintergreen Real Estate division of WDI -- Richard C. Carroll, Timothy C. Hess, Peter V. Farley and Kyle T. Lynn (together with WREC and HCA, the "Unnamed Co-conspirators").  At the same time, the Unnamed Co-conspirators incorporated WREC (using the name of the previous in-house sales division of

25.     WPI operates the Resort recreational, rental and commercial properties and other amenities. Owners of property in the Resort whose property carries with it a "Property Right of Membership" can become members of WPI by paying an activation fee and can enjoy the facilities by paying an annual fee. Property owners whose property does not have a " Property Right of Membership" can purchase that right, attach it to their property and, thereafter, activate their membership. The activation of this membership is called the "Premier Equity Membership". WPI represents to property owners that, when they sell their property, they will be able to obtain redemption of their membership at 80% of the then cost of activation (at the time of redemption). In fact, however, the right of redemption is actually conditioned upon WPI's sale of four new memberships or the seller's securing a membership activation from his purchaser within 60 days of the sale/purchase.

26.     Since 2000, WPI has consistently increased (a) the cost of the " Property Right of Membership," (b) the fee to activate a membership and (c) the annual usage fee, without improving the benefits to members. Typical of a monopolist, WPI has refused to reduce the price of memberships even as the number of memberships sold declines. The following is a chart of the increases in cost of the Property Right of Membership, the "activation fee" and the annual usage fee, and the resulting reduction in output:

---

WDI) as a real estate firm to market the properties owned by HCA and to handle resales of previously sold Resort properties.

| Year | Property Right of Membership | Activation Fee | Annual Charge | Memberships Sold |
|---|---|---|---|---|
| 2001 | $12,500 | $5,500[8] | $870 | $ 663,750 |
| 2002 | $12,500 | $14,000 | $2640 | $ 8,758,367[9] |
| 2003 | $12,500 | $15,000 | $2900 | $ 1,487,197 |
| 2004 | $13,000 | $16,000 | $3250 | $ 1,555,987 |
| 2005 | $13,500 | $17,000 | $3640 | $ 1,591,164 |
| 2006 | $14,000 | $17,000 | $4325 | [10] |

As is apparent from the above table, after the Premier Equity Membership was instituted, the sale of Property Rights of Memberships and activation fees have decreased each year.[11]

### The First Exclusive Agreement

27.     On November 28, 1999, WPI entered into the First Exclusive Agreement with WREC.[12]  Pursuant to that Agreement, WREC became the only real estate firm with an office in the Resort, and WPI agreed to prohibit any other real estate company from leasing sales office space in the Resort, conditioned upon WREC's generating for WPI no less than $400,000 net annually from the sale of Property Rights of Membership

---

[8]     The initial offering price of $5,500 was good for two months, after which it escalated to $10,000.
[9]     WPI operates on an April 20 fiscal year ending.  As a result, the 2002 financial statements reflect the financial condition and results of operations for May 1, 2001 through April 30, 2002.  During that time, WPI instituted the "Premier Equity Membership" which is described in this lawsuit.  As a result, the 2002 financial statements reflect the very substantial cash infusion resulting from WPI members converting to Premier Equity memberships.
[10]     The value of memberships and membership activations sold in 2006 will not been known until the 2006 financial statements are released.
[11]     Because the price of both the Property Right of Membership and the activation fee increased from 2003-2006, but the total sales proceeds remained almost exactly the same, the number of memberships and activations must have fallen each year.
[12]     HCA is also a party to the contract.  HCA is a limited liability company which is 80% owned by the owners of WREC.  HCA is dominated and controlled by WREC.  Contractual obligations that applied to WREC also applied to HCA.

and activation fees with regard to properties sold by WREC. The First Exclusive Agreement also provided WREC with the right to lease the former Orientation Center in Mountain Inn (across from the Reception desk) for five years, with a five year option to renew.[13] Until October 31, 2005, WREC had a real estate office in that space in Mountain Inn, directly astride the principal route for each and every person at the Resort to access all the ski slopes, retail shops, rental properties, conference facilities and principal restaurants of the Resort.

28. The First Exclusive-Agreement gave WREC market power in the Wintergreen Resort and Nelson County real estate resales market, foreclosing rival real estate companies from a substantial portion of the market and preventing them from achieving economies of scale.

29. WREC's market power is evidenced by its market share:

| Year | WREC's Market Share in the Resort | WREC's Market Share in Nelson County |
|------|------------------------------------|---------------------------------------|
| 2000 | 66% | 44% |
| 2001 | 68% | 49% |
| 2002 | 68% | 53% |
| 2003 | 75% | 61% |
| 2004 | 70% | 56% |
| 2005 | 66% | 52% |
| 2006 | 45%[14] | 31%[15] |

---

13     Throughout, WREC, in the exercise of its dominion and control over HCA, has caused HCA to allow WREC to have and enjoy all the benefits of that lease.
14     WREC's market share decline after the expiration of the First Exclusive Contract was cushioned by the factors set forth in note 2, *supra*. WREC's market share of listings has now fallen to approximately 29% and is declining, as a result of WRPP's having "first dibs" on all potential purchasers.

30.    Unfortunately for consumers, competitors and the market, there were considerable barriers to entry protecting WREC's monopoly power. For example, even if MAR developed a relationship with an existing property owner, when that property owner was interested in selling his property, he or she frequently listed it with WREC because of the universal perception that the illegal First Exclusive- Agreement gave WREC significant market power with respect to access to clients for Resort resales and was, therefore, in the most advantageous position to secure a purchaser for such property. WREC's market share of Resort listings reflects its market power, as set forth below:

| Year | WREC Share of Listings |
|------|------------------------|
| 2000 | 59% |
| 2001 | 57% |
| 2002 | 63% |
| 2003 | 66% |
| 2004 | 66% |
| 2005 | 66% |
| 2006 | 62% |
| 2007 (est) | 29% |

WREC's market power with respect to resort listings was caused by the First Exclusive-Agreement with WPI.

31.    As described above, on August 31, 2006, WPI announced a new illegal exclusive-dealing agreement with RWRE. This Second Exclusive Agreement established WRPP as "the resort's official on-site real estate firm," gave it the exclusive right to have

---

<sup>15</sup>    *See* note 2 and accompanying text. The decline in WREC's market share is totally accounted for by the loss of its exclusive rights under the illegal exclusive dealing Agreement.

a real estate office on Resort property, and, in terms even more restrictive and anti-competitive than the First Exclusive Agreement with WREC, the Second Exclusive Agreement provided that WRPP would be the only realtor on the Resort's web site, and it prohibited all other real estate firms from displaying any marketing materials on Resort property. Again, WPI has granted this illegal exclusivity in return for WRPP "pushing" the sales of Property Rights of Membership and membership activations and its rental program at supracompetitive rates[16] and, for the first time, a "cut" of the monopoly profits. .

32.     Pursuant to the Second Exclusive Agreement, WPI has, as a practical matter, forced property owners to deal with WRPP. In press releases, letters and advertisements, WPI tells property owners that WRPP is the Resort's only "official on-site real estate firm," has the "advantages of being *on the inside*" (emphasis in the original) which, according to WPI, "will work for you [because], as the only real estate firm with a physical presence on WPI's resort property, your property will receive enhanced exposure to hundreds of thousands of resort guests and visitors to our website."[17] In the place where MAR and other local realtors previously placed their brochures and advertising materials, WPI has placed a "kiosk that is immediately to your right when entering the lobby of the Mountain Inn" where "WRPP agents will also provide real estate services and information . . . ." In sum, as WPI describes the

---

[16]     WPI's pressure on WRPP to sell memberships, rather than fulfill its duty exclusively to represent the sellers who have given it the listings, is apparent from one of the first WRPP listing summaries on the multiple listing service ("MLS") which states: "Contracts including WPI membership activation strongly encouraged by owner." Discovery will reveal whether WRPP disclosed to the owner/seller the likelihood that urging a prospective buyer to include membership activation (currently priced at $17,000) in his offer would likely lower the offering price for the property, or whether WRPP has a financial interest in that activation fee, as WREC did. (WREC received $1500 for every Property Right of Membership or activation sold.)

relationship, "the resort's resources will be focused on our official on-site real estate firm, Wintergreen Resort Premier Properties."

33. WPI's attempt to rationalize the Second Exclusive Agreement as beneficial to property owners is false and misleading. WRPP, like WREC before it, forecloses competition and, thereby, is providing fewer choices and reduced services at higher prices, and WPI continues to charge supracompetitive prices for its memberships and property rental services. Moreover, even if the price of WPI memberships were at competitive levels, an obligation to sell memberships would not justify the exclusive-dealing arrangement because WPI can create incentives to sell memberships in much less restrictive ways.

34. The Second Exclusive-Agreement, like the First Exclusive Agreement, was awarded without competitive bidding or even any pretense of competition. Indeed, WPI was so supremely confident of the market power generated by the illegal Second Exclusive-Dealing Agreement that it selected for its chosen beneficiary a Charlottesville realtor who had no office, and did virtually no business, in Nelson County, and who obviously could not service Nelson County or Wintergreen Resort with the same knowledge, quality and efficiency that could have been obtained from an established Nelson County realtor such as MAR.

35. Although the Second Exclusive Agreement has only been in effect since September, 2006, it has had an immediate anticompetitive foreclosure effect. WRPP has secured a virtual monopoly on the attention of prospective purchasers for Resort real

---

[17] WPI does not even attempt to explain how a single real estate office could possibly offer "more exposure" for a seller's property than multiple firms engaged in vigorous competition within the Resort.

estate, even when those persons are existing property owners, and has secured a large proportion of the new listings of homes, condominiums and lots.

36.     As set forth in the description of this Complaint, *supra*, WREC has acknowledged the anticompetitive effect of the Second Exclusive Agreement by mailing the petition complaining about the new monopoly to its clients, expressly stating that WREC agrees with the petition's recitation of the harm to consumers and the market![18] Specifically, WREC wrote: "There is no doubt that [the exclusive dealing agreement between WPI and RWRE] will negatively affect *all* homeowners **for the reasons stated in the attached [petition].**" (emphasis added)  The attached petition describes in detail the harm to consumers caused by both the First Exclusive Agreement and the Second Exclusive Agreement: "We believe that this restraint of competition harms sellers of Wintergreen properties by making it more difficult to sell, keeping properties on the market longer, reducing the quality of real estate services, increasing commissions that must be paid and reducing the net sales price realized.  In addition, the restriction on competition hurts purchasers by reducing the number of agents with whom they may realistically work, makes their visiting available properties more difficult, subjects them to pressure to purchase WPI memberships which both increases the total price and

---

[18]     At least one property owner has recognized the hypocracy of WREC's change of heart, and wrote the following:
"[Y]ou and others associated with Wintergreen Real Estate benefited for many years from the exclusive non-compete nature of your operation at Wintergreen. * * * During that time your company charged any and all sellers a Seven (7%) commission, you had offices right in the middle of the development and no one was allowed to lease space to compete.  In fact, your company sued Mountain Area Realty when it first opened for business, did it not?  You had reserved parking spaces granted no one else. * * * All of the actions of your company "restrained competition and harmed sellers."  Now that the shoe is on the other foot you wish to cry  FOUL and have all of the homeowners believe you have had and continue to have all of our best interests at heart. WHO THE HELL ARE YOU KIDDING?  I know nothing about this new agreement nor anything about the new company, but I do know you and your partners have been feeding at the trough too long.  I think it is incredible hubris for you to cry foul." for (and increases the cost of) rentals of purchased properties."  *See* Exhibit 5 attached hereto.

thereby makes purchasers reduce their offers for the property itself and lessens the opportunities " *See* Exhibit 4 attached hereto (emphasis in the original).

## The Plaintiff's Injury

### Background

37.     In 1996, Robert R. ("Bo") Newell, who was then employed by WDI as a real estate salesman (and co-Sales Manager), left WDI and formed his own real estate company under the name Wintergreen Area Realty.  He incorporated his company, printed signs, offices supplies and marketing materials and began to advertise his business.  WPI, however, illegally claimed a proprietary interest in the name "Wintergreen" (a place name which cannot be proprietary to anyone) and threatened Mr. Newell with a lawsuit if he did not cease and desist from using the name he had chosen. Unable to afford litigation, Newell changed his business name to Plaintiff MAR. On information and belief (*see* footnote 18), WPI took that action against him at the instigation of WREC.

38.     Sometime after he formed MAR, Newell was joined in the business by his wife, Nancy Hernandez (who had also been a real estate salesperson at WDI), and, subsequently, by her son, Benjamin Hernandez, the two of whom also have an ownership interest in MAR.

39.     Since 1996, MAR has attempted to compete for the resale of Resort properties but has never obtained more than a 28% market share and its market share

declined steadily during the term of the First Exclusive Agreement. This decline has taken place because of Defendants' unlawful conduct and despite MAR's best efforts to develop and utilize alternative means of competition.

40. Indeed, this decline has occurred even though MAR is more efficient than WREC and WRPP, and even though MAR offers lower commissions, superior service, including regular open houses and extensive advertising, a sophisticated web site and annual bonuses and larger commission payment percentages for its associated realtors -- none of which are provided by WREC or RWRE.[19]

41. In particular, in its attempt to compete against the illegal exclusive-dealing agreements, MAR adopted every alternative means of competition it could devise. For example, MAR offered lower commissions -- 6-8% (compared to 10% charged by WREC) on land and 5-5 ½% (compared to 6-7% charged by WREC) on homes and condominiums. Despite the lower total commission, MAR offered a full 3% (4% on land) cooperative commission to the selling agency.

42. Similarly, MAR offered superior service, holding regular open houses in the properties on which it secured listings. Open houses are important to both sellers and buyers because, in the case of sellers, they expose their properties to more potential buyers and increase demand[20] and, in the case of buyers, they provide product and price comparisons. In contrast, WREC refused to hold regular open houses. When WREC's largest customer requested open houses for its properties, WREC refused to do so. Despite WREC's intransigence, this customer -- which conducted millions of dollars of

---

[19]     On information and belief, WREC does not pay annual bonuses to its associated realtors and its commission percentage payout to all of its realtors is less than that of any associated realtor at MAR.

business through WREC -- did not believe that it could afford to list with anyone other than WREC because of WREC's market power in the Resort.

43. MAR's superior services also included a state-of-the-art website, preparation of color brochures and other promotional literature and extensive advertising[21] which also promoted the Resort and memberships in WPI.[22] In contrast, WREC's market power allowed it to skimp on advertising and promotion for resale properties[23] and otherwise to ignore the interests of consumers and the market in promoting the Resort.

44. Despite increasing marketing and promotion expense virtually every year, MAR's market share declined shortly after the First Exclusive Agreement took effect and new listings shifted to WREC. The following chart sets forth MAR's market share in Wintergreen Resort and in Nelson County:

---

[20]     In normal markets, open houses assist sellers in securing offers and reduce the time their property is on the market. In "red hot" markets, such as existed in 2004-2005, open houses contribute to the number of offers, including stimulating bidding wars which result in contracts in excess of the listing price.

[21]     The following is a chart of MAR's expenditures on advertising and promotion which, on information and belief, exceeded WREC's expenditures for advertising and promotion of resale properties during the respective time periods, despite the fact that WREC's market share was, at all relevant times, approximately three times MAR's market share:

| Year | MAR Advertising and Promotion Expense |
|---|---|
| 2000 | $161,306 |
| 2001 | $159,385 |
| 2002 | $176,213 |
| 2003 | $193,511 |
| 2004 | $215,813 |
| 2005 | $248,960 |
| 2006 (thru 10/17) | $200,810 |

[22]     MAR also engaged in internet advertising on its web site but such advertising has not been effective to sell real estate. MAR's experience during the first illegal exclusive dealing Agreement proves beyond peradventure that this alternative method of competition is wholly inadequate to counter the exclusive firm's market power and dominant position.

[23]     In contrast to MAR's promotion of resales, WREC regularly advertised only its own and HCA's properties.

| Year | MAR Market Share in Nelson County | MAR Market Share in Wintergreen Resort |
|------|-----------------------------------|----------------------------------------|
| 2001 | 29% | 26%[24] |
| 2002 | 26% | 28% |
| 2003 | 23% | 19% |
| 2004 | 21% | 20% |
| 2005 | 22% | 15% |
| 2006 | 25% | 27% |

45.        MAR's market share, compared to WREC's market share, dramatically demonstrates the power conveyed by the First Exclusive Agreement.  As new competitors entered the market in 2003 - 2005, their market share came entirely from MAR, while WREC's market share, insulated by the monopoly, was unchanged. Only in 2006, when WREC lost its monopoly, was MAR able to increase its market share as compared to both WREC and other competitors.  At that time, after WREC lost its exclusivity and before the Second Exclusive Agreement started to take effect, MAR's share of the Resort resales jumped to 27%.

46.        Despite MAR's lower commissions, the First Exclusive Agreement allowed WREC to maintain its supracompetitive commission structure.   Indeed, when WREC's largest customer requested reduced commissions based upon volume, that request was summarily denied and the customer was specifically told that, if it didn't like the WREC commission structure, it could go elsewhere.  Of course, WREC knew that the customer could not go elsewhere, and the customer did not go elsewhere.

47.     Because of WREC's monopoly position and the resulting perception that any real estate agent would have an easier time achieving a superior commission income, MAR was perpetually faced with the loss of associated agents.  As a result, it had to offer its agents annual bonuses and superior percentage commission payouts.  MAR believes that its bonuses and commission payouts are substantially in excess of any paid by WREC.

48.     Despite all its efforts, MAR could not effectively compete against WREC's market power.  Typical of the harm MAR suffered is the following email (attached as Exhibit 6 hereto) from a property owner with whom MAR had a personal relationship:

> "[A]lthough we LOVE working with you, we are listing our home with Wintergreen Real Estate.  We feel that a lot of people look at homes during a fun weekend of skiing without ever having planned to do so.  We feel these people are more likely to approach Wintergreen b/c they are on the top of the mountain and are probably referred to more by the Mountain Inn etc.  We are just trying to make the best decision to sell our home the fastest . . . ." (capitals in the original)[25]

49.     The force of WREC's market power are dramatically demonstrated by the fact that, after losing its monopoly position, WREC's market share  fell to approximately one-third or less and is still declining, while MAR's market share was sharply rising, at least until the Second Exclusive Agreement.

---

[24]     There was a lag time before the effects of the First Exclusive-Dealing Agreement fully appeared. The lag time essentially reflects the run-off of pre-contract listings plus the time between a new listing and a sale.  Thus, the effects of the First Exclusive Dealing Agreement were not fully apparent until 2003.

## OTHER ANTICOMPETITIVE PRACTICES BY WPI AND WREC IN FURTHERANCE OF THE CONSPIRACY AND MONOPOLY

50.     As part of its attempt to develop alternative means of competition in the face of the  monopoly power created by WPI's illegal exclusive-dealing agreements, MAR owned and maintained unit 1411 in the Highlands condominium complex.  It advertised it as being for sale (and it was) and conducted open houses in it.  Unit 1411 also served as a place where MAR brokers and agents could meet potential purchasers and establish business relationships with them.  WREC would not tolerate even this meager attempt at competition.  With WPI's knowing consent and participation, WREC induced the Board of Directors of the Highlands condominium to allow WPI's and WREC's attorney, Stuart Sadler to prepare a letter to MAR, open copy to Sadler, trumping up a purported violation of the condominium governing documents and threatening legal action.  The letter sought to give the impression of due process for MAR, inviting it to a "hearing" on WPI's premises where MAR could "be heard on this violation," but it conclusively demonstrated the "kangaroo court" nature of the offered hearing when it notified MAR that "upon conclusion of this hearing, if the cars of your guests or invitees trespass on our lot, they will be towed" and, "if you continue this use of Unit 1411, we will file suit . . . ."  A copy of this letter is attached as Exhibit 7.  Unable to afford protracted litigation, MAR was forced to agree that it would only use Unit 1411 on weekends, thereby substantially limiting its value as a competitive tool.

51.     WREC continued to employ Sadler to harass MAR in order to cripple its competitive efforts.  First, when MAR sought to use a map of the mountain portion of the

---

[25]     This email was written on February 9, 2006, after WREC lost its sales office in Mountain Inn but while it still had the exclusive right to be "on the mountain."

Resort to demonstrate to potential customers the location of resale properties, Sadler claimed that WREC had a copyright and proprietary interest in the map.[26] In order to avoid litigation, however baseless, MAR was forced to recreate the map from scratch. Subsequently, in 2006, Sadler complained about MAR's use of a map of the Stoney Creek area of the Resort which had been in constant use by all real estate agents in Nelson County for a decade,[27] saying that WREC had a proprietary interest in it. Again, in order to avoid litigation, MAR was forced to prepare its own map from the original property survey.

52.     Similarly, when MAR developed a state-of-the-art web site as an attempt to compete against the WPI-WREC illegal exclusive dealing Agreement, WREC hired a Washington intellectual property lawyer to threaten MAR with legal action if it used the words "Wintergreen Real Estate" in any of the key words on the site. A friend of Newell's who was an attorney advised him that the claim was feckless but, being unable to afford litigation over each and every attempt he made to compete, Newell agreed not to capitalize "Real Estate" on the web site, which limited the value of the web site as a competitive tool.

53.     Because of the market power created by the illegal exclusive-dealing Agreement, WREC consistently refused to reveal to its clients the listings of any other real estate firms. On numerous occasions, at MAR open houses, MAR agents have met potential purchasers who commented that "we've been working with WREC [who would

---

[26]     In fact, the map had been copyrighted in 1993 by WDI and, on information and belief, no assignment of that copyright, by operation of law or otherwise, had ever been made to WREC.
[27]     When Newell went into independent business in 1996, he requested from WDI, and received, copies of the Stoney Creek map. When his supply was exhausted, he copied the map and he and new entrants into the Resort resales market used the map, without complaint from WDI, from that time on. Again, on information and belief, WREC has no copyright or proprietary interest in the map by assignment,

not tell them about MAR open houses or take them to one] and are interested in a property like this, but no one ever told us it was listed." Withholding information about listings held by other real estate companies injures consumers and competition and violates WREC's contractual obligations and fiduciary duties to its clients.

54. Further, throughout all relevant times, WREC breached its regulatory, fiduciary and contractual obligations to its clients by not allowing their MLS-listed properties to appear on the web sites of other real estate agencies, all as part of its intent and actions to maintain its market power and dominant position.

55. Further, on information and belief, the WREC principals instruct their associated agents not to reveal or sell the listings of other realtors. On one occasion of which MAR is aware, clients of MAR had listed their Stoney Creek home with MAR but it was not being shown by WREC agents. The sellers saw a WREC principal and asked why WREC agents were not showing the house. The WREC principal replied, "You've got it listed with the wrong people; we'll never show your house so long as it is listed with Mountain Area Realty."[28]

56. All of the foregoing actions were anticompetitive, were possible only because of WPI's illegal exclusive dealing agreements, excluded rivals and unreasonably restrained trade.

---

operation of law or otherwise. The map itself reflects a copyright held by "Wintergreen," which is a place name, not a business entity.

## THE ILLEGAL EXCLUSIVE-DEALING AGREEMENT GAVE
## WPI A MONOPOLY ON RESORT RENTALS

57.     WPI's unlawful conduct not only resulted in overcharges to consumers seeking to sell their property, but also to consumers seeking to rent their property.

58.     Many owners of property in the Resort hold their properties for investment and desire to rent them to help defray the cost of ownership and to produce a return on their investment.  The business of managing those rentals is a lucrative one and the exclusive-dealing agreements unreasonably restrained trade in that market as well.  As set forth above, the exclusive-dealing agreements foreclosed real estate agents other than WREC (now, WRPP) from having an office on Resort property, particularly in Mountain Inn, which is essential to conducting a rental operation.  Moreover, upon information and belief, in conjunction with the illegal exclusive-dealing agreements, WREC and WRPP agreed, either expressly or impliedly, to refrain from competing with WPI in Resort property rentals.

59.     On information and belief, as a result of the illegal exclusive-dealing agreements and the foreclosure of competition, WPI has consistently had a market share in Resort rentals in excess of 60%.  As a result of this market power, WPI's rental program is characterized by high one-time charges to enroll (which discourage switching to a competitive service), supracompetitive commission rates (50% of gross rentals,[29] whereas the competitive market commission rate is 25%), excessive charges and numerous mechanisms which discourage or prevent competitive entry.  WPI precludes

---

[28] He went on to slander MAR's business reputation by saying that MAR "doesn't know what they are doing."  Such conduct violates the Realtor Code of Ethics and injures consumers and competition. Such conduct was only possible as a result of the illegal exclusive dealing Agreement

[29]     The rental commission is thirty percent on houses, but the homeowner has to provide the cleaning service.  WPI's rental program includes a very small number of houses as opposed to condominiums and townhouses.

any competitor or potential competitor from meeting tenants or delivering keys to units on Resort property. As a result of this last factor alone, it is practically impossible for anyone to compete with WPI's rental program.

60. Moreover, pursuant to the Second Exclusive-Dealing Agreement, WPI has used WRPP to expand its rental program monopoly. A recent listing states: "And, these slope-side units are in high demand as rentals - consider the rental program as a way to reduce your cost of ownership."

61. Since the First Exclusive Agreement was entered into in 1999, WPI's net commission revenues from its rental program have been as follows:

| Year | WPI Net Rental Commission Revenues |
|------|-----------------------------------|
| 2001[30] | $3,900,021 |
| 2002 | $4,052,883 |
| 2003 | $3,648,727 |
| 2004 | $3,756,986 |

On information and belief, all of the competitors' net rental revenue from the Resort properties listed by them is miniscule.

62. Because of the foreclosure effects created by the exclusive dealing agreements and the side agreements with WREC and RWRE, WPI has been able to subject property owners to unreasonable and disadvantageous terms. For example, participants in the WPI rental program are not allowed to participate in competitive rental programs (the WPI inspectors and cleaning crews check to see if there are signs of occupancy by tenants referred by competitors). The fee for entry into the WPI program is

high -- $1000 (there is no fee to enter any of the competitive programs), and nonrefundable. WPI offers no discount for placing multiple properties in the program.

63.     WPI also exacts supracompetitive prices for services connected to the rental program. For example, if WPI determines that there is some problem with a unit -- whether as small as the absence of a potholder (WPI charges the unit owner for items that *its renters* break or steal) or as large as a water leak -- WPI just fixes it and sends the owner a bill, often without even contacting the owner (even when there is a contact, there is no practical alternative for a non-resident owner). The prices for these services are supracompetitive, frequently exorbitant, particularly in light of the fact that WPI charges an annual maintenance charge of $300 in addition to the specific charges for services and supplies. Similarly, WPI charges $36.00 per month for telephone service to each rental unit, even though that service is provided through its switchboard at no marginal cost. Similarly, WPI charges $36.00 per month for cable TV service to each rental unit, a price which far exceeds its marginal cost. Further, WPI forces every participant to provide high-speed DSL service to the unit and charges $19.95 per month, even though, on information and belief, it obtains the service in bulk for a fraction of the charge and despite the fact that few of the units even have the connections to allow use of the service.

64.     Owners frequently complain about all these aspects of the WPI program but, because of the market power resulting from the exclusive dealing agreements and side agreements with WREC and RWRE, WPI has no need to respond or change, and it hasn't.

---

[30]     WPI did not begin separately to report net income from its rental program until its FY 2002 financial statements, which contain the prior year's figures as well.

## INJURY TO CONSUMERS AND TO COMPETITION

65.     As set forth above, the illegal exclusive-dealing Agreements have injured the market and competition:

- by foreclosing competition among real estate companies at the Resort ;
- by giving locked-in buyer/consumers less choice in their real estate purchases;
- by effectively causing locked-in buyer/purchasers to pay an increased total price to purchase real estate and coercing them to buy WPI memberships which they do not really want;
- by giving locked-in seller/consumers less choice in real estate services;
- by effectively causing locked-in seller/consumers to pay supracompetitive rates for real estate services;
- by making it more difficult for seller/consumers to sell their properties and causing seller/consumers to wait longer for their properties to be sold; and
- by effectively causing WPI member/consumers to pay supra-competitive prices for Property Rights of Membership, activation fees and annual usage charges,

all in the relevant markets. Thus, this is not a case of a property owner (WPI) using its property as it wishes but, rather, of a property owner entering into illegal exclusive-dealing agreements, foreclosing competition and coercing consumers into paying higher rates for, and having less choice in, real estate services, and forcing consumers to pay supracompetitive prices for memberships, activation fees and annual charges.[31]

---

[31]     And, under the Second illegal exclusive dealing Agreement, a "cut" of the supracompetitive listing and sales commissions.

66. Similarly, WPI's market power in resort rentals has injured the market and competition:

- by foreclosing competition among real estate companies;

- by effectively causing locked-in consumer/renters to pay higher prices for rentals than they would in a competitive market;

- by limiting the choices of consumer/renters;

- by effectively causing locked-in consumer/property owners to obtain fewer rentals and lower net rental income than they would in a competitive market; and

- by effectively causing consumer/property owners to pay supracompetitive prices for services required by WPI,

all in the relevant markets.

67. In particular, the harm to seller/consumers (and the parallel unjust enrichment of WREC) caused by WPI's First Exclusive Agreement and the resulting supracompetitive commissions which seller/consumers have paid WREC is computed as follows. The total sales by WREC from the inception of the illegal exclusive dealing agreement to the termination of the first Exclusive-Dealing Agreement is $352,825,087. The average commission charged by WREC is 6.3960%,[32] compared to the average commission of 5.6485% in a competitive market.[33] The difference of .7475% is multiplied by WREC's total sales, for a total supracompetitive profit of $2,637,367.

---

[32] This computation utilizes 6% as the WREC commission on houses and condominiums. In fact, in most transactions during the computation period, WREC's commission was 7% but Plaintiff did not have the detailed transaction-by-transaction information necessary to use 7% on the applicable transactions. After discovery, an exact computation can be made and, as a result, the damages will be substantially higher.

[33] It is notable that, when WREC charged a 7% commission rate on its listings, it gave cooperating brokers who actually produced the sale for the property only 3%, keeping 4% for itself. Similarly, when MAR offered competitive listing commissions of 5 ½%, it was forced to give a full 3% to the selling broker, keeping only 2 ½% for itself. Thus, the foregoing computation of WREC's overcharges is

68.     In addition, the harm to buyer/consumers (and the parallel unjust enrichment of WREC) caused by WREC's failure to offer standard real estate services, such as regular open houses, is computed as follows.  Open houses are an expense to a real estate company and its agents, because the time expended in holding open houses could otherwise be profitably used to secure additional listings and sales.  MAR estimates that each of its agents spent at least eight hours per week on open houses, or approximately 20% of their time.  Assuming that time spent on open houses would have been proportionally successful in securing listings and sales, approximately 20 of the sales of a firm which does not hold open houses is attributable to that economic benefit.  As a result, during the period of the illegal exclusive dealing Agreement, WREC was unjustly enriched by approximately $70 million in sales which, at their average commission rate of 6.3960, resulted in approximately $4.5 million of improperly received commissions. The unjust enrichment to WREC is an appropriate measure of the harm to consumer/buyers and, as a result, consumer/buyers have been further injured in the amount of at least $4.5 million.[34]

69.     Similarly,  the foreclosure effect of the exclusive dealing agreements and the related side agreements has harmed the consumers in the WPI rental program by causing them to pay supracompetitive commissions to WPI (which, in turn, constitute unjust enrichment of WPI).  On the conservative assumption that, in a competitive market, the other resort rental firms would obtain 50% of the market enjoyed by WPI and

conservative because it relies upon average commission rates (using 6% on houses and condominiums, not the 7% WREC frequently charged) not the actual, even larger, supracompetitive portion WREC arrogated to itself.

[34]     This calculation does not include the additional harm to consumers resulting from their properties being on the market longer and not being exposed to all potential purchasers, both of which were caused by WREC's ability to refuse to hold regular open houses as a result of its market power derived from WPI's First Exclusive Agreement.

would charge only a 25% commission, instead of WPI's 50% commission, then half the rental commission income realized by WPI since the inception of the illegal exclusive dealing Agreement constitutes unjust enrichment to WPI and harm to consumers. Using only the figures for 2001 and thereafter, the harm to consumers and unjust enrichment of WPI totals $ 7,679,309.

70.     In addition, the illegal exclusive dealing agreements have harmed competitors, particularly MAR. MAR lost commission income as a result of the foreclosure effect of the illegal exclusive-dealing Agreements and the resulting market power which WPI's exclusive agreements accorded to WREC, and now to WRPP. The following is a chart of the respective market share and sales of WREC and MAR in Wintergreen Resort  from the inception of the First Exclusive Agreement through 2005, including the respective market shares in 2006 when WREC lost its monopoly and when, tellingly, its market share plummeted, as shown in the following table:

| Year | WREC Sales | WREC Market Share | MAR Sales | MAR Market Share |
|------|------------|-------------------|-----------|------------------|
| 2000 | $  24,890,925 | 66% | $   9,574,250 | 25% |
| 2001 | $  28,590,827 | 66% | $ 10,922,733 | 26% |
| 2002 | $  40,788,214 | 73% | $ 16,834,380 | 28% |
| 2003 | $  61,232,309 | 75% | $ 15,825,081 | 19% |
| 2004 | $  89,614,976 | 70% | $ 25,906,100 | 20% |
| 2005E35 | $ 107,707,836 | 66% | $ 24,875,749 | 15% |
| 2006E36 | $  38,297,944 | 45% | $ 21,588,400 | 27% |

---

[35]     WREC's 2005 sales are estimated by taking the actual deed transfers for Nelson County properties and comparing them to those properties shown as sold in MLS. The MLS sales attributed to WREC were

71.     On the conservative assumption that WREC's market share in a competitive market would have been 30% and MAR's would have been 45%, and assuming a competitive commission structure of 8% on land and 5 ½% on homes and condominiums (a weighted average commission of 5.6485),[37] MAR's commissions lost as a result of the illegal exclusive dealing Agreement are as follows:[38]

On the selling side: $114,114,762 times 3% = $3,442,872

On the listing side: $85,715,275 times 2.6485% = $2,270,169[39]

Thus, MAR's total lost commissions as a result of the illegal agreement between WPI and WREC is $5,713,041.

## COUNT I
### (Sherman Act § 1)
### (Against all Defendants)

72.     MAR realleges and incorporates by reference each and every allegation set forth above.

73.     Both the First Exclusive Agreement and the Second Exclusive Agreement are agreements that unreasonably restrain trade.

74.     As a result of the First Exclusive Agreement, WREC possessed market power, and, as a result of the Second Exclusive Agreement, WRPP possesses market

---

added to the Wintergreen Resort sales not listed in MLS because of WREC's anticompetitive practice in that regard and because all other realtors include all their listings in MLS.
[36]     WREC 2006 sales (through October 15) are estimated using the same methodology as set forth in footnote 36.
[37]     From 2000-2004, WREC's sales consisted of 90.1% homes and condominiums and 9.9% land.
[38]     The total volume of Wintergreen Resort sales was determined for each year, and totaled for the last four years, and then multiplied by .45. From that was subtracted the total volume of MAR sales in the Wintergreen Resort for the last four years. That difference is reported above and multiplied by 3%, the seller's commission on the average mix of resale properties in a competitive market. The same analysis and computation was performed for the listing side except that the commission rate used was 2.6485%, for the reasons described in note 40.
[39]     Assuming that, in a competitive market, the prevailing commission structure would look like the one utilized by MAR in its attempts to compete with WREC, the listing agent would pay a 3% cooperative commission to the selling agent and would retain the balance of the commission (2.6485%) for itself.

power, in the market for real estate services in Wintergreen Resort and in the larger market of Nelson County, Virginia -- both of which are relevant antitrust markets.

75.     Both the First Exclusive Agreement and the Second Exclusive Agreement are unreasonable restraints of trade which have harmed competition in the relevant markets.

76.     There are no offsetting procompetitive results.

77.     Both the First Exclusive Agreement and the Second Exclusive Agreement violate and, as a result of the conduct set forth above, all Defendants have (together with unnamed Defendant WREC) violated, §1 of the Sherman Act, 15 U.S.C. §1.

78.     As a result of the foregoing illegal conduct, MAR has suffered injury to its person or property.

## COUNT II

**(The Virginia Antitrust Act)**
**(Against All Defendants)**

79.     MAR realleges and incorporates by reference each and every allegation set forth above.

80.     Both the First Exclusive Agreement and the Second Exclusive Agreement are agreements in restraint of trade and unreasonably restrain trade in the relevant markets.

81.     As a result of the First Exclusive Agreement, WREC possessed market power and, as a result of the Second Exclusive Agreement, WRPP possesses market power in the market for real estate services in Wintergreen Resort and in the larger market of Nelson County, Virginia - both of which are relevant antitrust markets.

82.     Both the First Exclusive Agreement and the Second Exclusive Agreement have harmed competition in the relevant markets.

83.     There are no offsetting procompetitive results.

84.     As a result of the foregoing illegal conduct, MAR has suffered damage to its person or property.

85.     The actions of the Defendants were willful or flagrant.

## COUNT III
### (Common Law Conspiracy)
### (Against All Defendants)

86.     MAR realleges and incorporates by reference each and every allegation set forth above.

87.     As set forth above, all Defendants and Unnamed Defendant WREC conspired together to violate the antitrust laws, to commit common law fraud and to violate the Virginia Consumer Protection Act and otherwise to do what is wrongful and harmful to consumers, to competition and to MAR and to unjustly enrich WPI, WREC and WRPP. As a result, all Defendants are liable for common law conspiracy.

## COUNT IV
### (Violation of the Virginia Business Conspiracy Act)
### (Against All Defendants)

88.     MAR realleges and incorporates by reference each and every allegation set forth above.

89.     As set forth above, all Defendants and Unnamed Defendant WREC combined, associated, agreed, mutually undertook or concerted together for the purpose of willfully and maliciously injuring MAR in its reputation, trade, business or profession and MAR's reputation, trade or business has been damaged by such business conspiracy.

As a result, all Defendants have violated VAC §18.2-499 and MAR has a civil cause of action against them for such damage pursuant to VAC §18.2-500.

## COUNT V
### (Common Law Fraud)
### (Against All Defendants)

90.    MAR realleges and incorporates by reference each and every allegation set forth above.

91.    WPI's willing and active participation in the First Exclusive Agreement to restrain trade, WPI's and WRPP's willing and active participation in the Second Exclusive Agreement to restrain trade and the conspiracy with WREC and WRPP in connection with the above, which are set forth in detail in the above allegations, were knowingly fraudulent.

92.    WPI's and WRPP's conduct, directed, aided and abetted by Defendants Ashton, Williams and Kollmorgen as set forth above, constitutes common law fraud.

## COUNT VI
### (Virginia Consumer Protection Act)
### (Against WPI)

93.    MAR realleges and incorporates by reference each and every allegation set forth above.

94.    WPI is a supplier of resort services used primarily for personal or family purposes.

95.    WPI committed fraudulent acts or practices in connection with its supply of resort services used primarily for personal or family purposes. In particular, WPI used deception, fraud, false pretense, false promise or misrepresentation in connection with its

supply of such services by violating the antitrust laws, by conspiring to violate the antitrust laws, and by committing or participating in the commission of common law fraud, as set forth in detail above. WPI acted willfully and maliciously in connection with its violations of the statute.

96.     Such actions by WPI violate Virginia Code §59.1-196 et seq.

## **PRAYER FOR RELIEF**

WHEREFORE, MAR prays that this Court enter judgment:

A.     That MAR recover its actual and compensatory damages according to proof at trial;

B.     That MAR's damages be trebled in accordance with the antitrust laws of the United States and Virginia;

C.     That MAR be awarded pre- and post-judgment interest as permitted by law;

D.     That WPI, RWRE and WRPP and their agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and others acting in concert with any of them be preliminarily and permanently enjoined from maintaining any exclusive agreement or course of dealing with regard to real estate services in Nelson County, Virginia, market or in Wintergreen Resort.

E.     That WPI be ordered to afford MAR an office in Mountain Inn at a market rate of rental for a period of no less than ten years;

F.     That MAR be awarded punitive damages without statutory limit;

G.	That MAR be awarded its reasonable attorneys' fees and costs of suit as allowed by law; and

H.	That the Court grant MAR such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

MAR demands a trial by jury as to all issues so triable.

Dated:  February 22, 2007

[Remainder of this page left intentionally blank]

Respectfully submitted,

GREENBERG TRAURIG LLP

_____
Geoffrey J. Greeves (VSB# 41499)
C. Allen Foster (applicant pro hac vice)
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006
202/331-3102

Maria P. Logan (VSB# 47800)
1750 Tysons Boulevard, Suite 1200
McLean, VA 22102
703/749-1370

Attorneys for Plaintiff Mountain Area Realty, Inc.

OF COUNSEL:

Garret G. Rasmussen
ORRICK, HERRINGTON & SUTCLIFFE, LLP
Suite 200, Washington Harbor
3050 K St., N.W.
Washington, DC 20007
202/339-8400

ERIK D. BOLOG (VSB# 33427)
6701 Democracy Blvd, Suite 515
Bethesda, MD 20817
240/542-1041