**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

MOUNTAIN AREA REALTY, INC.,
a Virginia corporation,

       Plaintiff,

v.                                                 Civil Action No. 3:07CV00016

WINTERGREEN PARTNERS, INC.,
*et al.*

       Defendants.

**BRIEF IN SUPPORT OF MOTION TO**
**DISQUALIFY GREENBERG TRAURIG LLP**

NOW COMES Wintergreen Partners, Inc. ("WPI"), by counsel, and for its Brief in Support of Motion to Disqualify Greenberg Traurig LLP ("Greenberg Traurig"), states as follows:

**Preliminary Statement**

Wintergreen Partners, Inc. (WPI) filed a Motion to Disqualify Greenberg Traurig because it was Dennis Hillier, a Greenberg Traurig equity partner, who advised WPI to inaugurate the pricing policy which is being attacked in this lawsuit and which is identified in the lawsuit as a motive for an allegedly illegal conspiracy.  As Mr. Hillier well knows, this allegation is false because it was he who advised that the rate structure be adopted.  Mr. Hillier made a comprehensive review of WPI's operations and advised WPI how to position the Resort to be more competitive and to better serve its members and guests.  He was given access to all information.  He was paid more than $345,000 for his efforts.

It is obviously inappropriate for a law firm to be expressly attacking the advice provided by one of its partners, and it is paradoxical that the law firm asserts that the partner's knowledge and expertise is limited so that he would not have recognized improprieties in the operation of a club even though he is nationally recognized as the premier lawyer for clubs and resorts in the United States.  In order to obtain this advice, WPI provided Mr. Hillier and his firm with full access to all of WPI's confidential information and full access to all WPI employees.  Hillier and his team interviewed not only key members of management, but also alleged "unnamed conspirators" and Bo Newell, the president of the plaintiff in this case, Mountain Area Realty ("MAR").  Hillier had numerous discussions with Robert Ashton, an individual defendant here.

While the law firm attacks its partner, WPI asserts that Mr. Hillier's reputation is deserved, his expertise is extensive, and his advice was correct.  If there had been any impropriety in any of WPI's operations, he would have recognized it and so advised.  His advice in regard to the rate structure and how to be competitive was appropriate and correct.  WPI feels Mr. Hillier is obligated to defend his advice while his law firm wishes to attack it.  Under these circumstances, disqualification is mandatory.

On February 22, 2007, Greenberg Traurig filed a Complaint against WPI and others seeking over $6 million in actual damages (and a request for trebled damages) for alleged federal and state antitrust violations and related state law torts.  Among other things, the Complaint alleges that the membership fees charged by WPI (based on advice provided by Hillier) are illegal.  The Complaint alleges that the membership fees indirectly harm property owners and make it more difficult to sell property at the Resort.  The Complaint alleges that WPI and other co-conspirators have maintained membership fees at supracompetitive levels to further their

illegal, monopolistic goals.  The Complaint nowhere mentions that these fees were based upon Mr. Hillier's advice.

WPI has repeatedly attempted to discuss these allegations with Mr. Hillier to prepare to defend this multi-million dollar lawsuit.  Mr. Hillier, however, apparently has decided that, given his firm's attorney-client relationship with MAR, he either should not or, more likely, cannot assist WPI in its defense.  Any assistance to WPI would, of course, undermine Greenberg Traurig's representation of MAR.

Upon being advised of this conflict, Greenberg Traurig has refused to withdraw, instead claiming that the allegations relating to Mr. Hillier's advice can be excised through an amended complaint.  This proposed solution ignores the substantial confidential information provided to Mr. Hillier, the interconnection of the membership issue with the other allegations, and that Greenberg Traurig's representation of MAR prevents WPI from having any conversations with Mr. Hillier, whether privileged or otherwise, concerning his advice.  Because this representation constitutes a conflict of interest that is directly affecting WPI's ability to prepare a defense in this case, WPI respectfully requests that the Court disqualify Greenberg Traurig.

## Argument

### I.    Background

In the 30 years since graduating from law school, Mr. Hillier has become one of few practicing attorneys, if not the leading attorney, in private club and resort law.   Mr. Hillier is one of a handful of United States lawyers specializing in this niche area.  His on-line biography describes the full breadth of his experience and expertise and his "pioneer" status in this field:

> Dennis W. Hillier, founding partner of the law firm, Hillier & Associates, P.A.,
> concentrates his practice on corporate and real estate law, with emphasis on the

design of club membership programs.  Dennis is recognized as the pioneer in the industry of equity club conversions and membership programs.  During the past 30 years, he has designed over 1,800 membership programs throughout the United States, Caribbean, Europe and the Pacific Rim.  Dennis has designed these programs for a wide variety of developments encompassing a broad range of amenities and target markets, including golf, tennis, equestrian, yacht and social facilities for communities with low density and permanent residents, to resort oriented communities.

(See Ex. 1).

WPI is a membership organization that owns and operates the amenities at the Resort.[1]

(See Declaration of Robert S. Ashton ("Ashton Decl."), attached as Exhibit 2 ¶ 2).  In the fall of 2000, WPI engaged Mr. Hillier to provide legal advice regarding the Resort's operation and, in particular, to review and advise WPI on membership services and programs.  (Id. ¶ 3).  At the time WPI engaged Mr. Hillier, he was the senior partner of Hillier & Associates, a boutique firm specializing in private club and resort law.  (Id. ¶ 4; Ex. 3).  Hillier & Associates offered a variety of resort-related services including the ability to conduct a critical evaluation of existing membership programs and to provide advice on maximizing membership revenue and services.[2]

In February 2001, Hillier & Associates provided WPI with its initial analysis and recommendations in a multi-volume set that included a 36-page summery analysis[3] of the Resort

---

[1] In addition to WPI, there is a more traditional property owners association, Wintergreen Property Owners Association ("WPOA"), which operates within Wintergreen Resort.  All property owners automatically become members of WPOA and control its operations.  WPI, on other hand, owns and operates the Resort's amenities (i.e., those aspects that make it a resort and not just a neighborhood).  Where used in this brief, the term "Resort" refers to those aspects of WPI's operations at the Resort and should not be confused with the separate functions of WPOA or WREC/HCA as successors to the original developer.

[2] Attached collectively as Exhibit 3 are pages from Hillier & Associates' website.  These pages illustrate the full service nature of the firm's resources, including not only legal advice, but also administrative and marketing advice.

[3] Because of the volume of work product prepared by Mr. Hillier for WPI, this information has not been attached.  In accordance with accepted practice for disqualification

and its real estate and membership programs.  (Id. ¶ 10).  This report included a survey of

comparable resorts nationally and regionally, an in-depth analysis of existing membership

programs, advice as to new membership programs, advice as to marketing membership

programs, and specific advice regarding proposed price changes for memberships.  (Id.).  Hillier

& Associates charged WPI approximately $130,000 for this initial review, analysis, and

recommendations.  (Id. ¶ 5).

     In reliance upon Mr. Hillier's expertise and recommendations, WPI made a number of

changes to its membership programs.  (Id. ¶ 11).  Included in these changes were increases in

membership prices and adjustments to membership services.  (Id.).  WPI believed that these

changes were justified based upon Mr. Hillier's recommendations and his legal expertise with

respect to private clubs and resorts.  (Id.).  Mr. Hillier and his firm assisted with the

implementation and marketing of the new membership programs.  In fact, Mr. Hillier's fees

depended upon the success of the program because they were based upon a percentage of the

revenue generated.  (Id. ¶ 5).  The total fees paid to Hillier & Associates were approximately

$345,000 (Id. ¶ 6), which includes the $130,000 for the initial review plus the additional fees for

implementation of the program – in other words, the part MAR claims was a conspiracy.

     In 2005, Greenberg Traurig acquired Hillier & Associates.  (See Ex. 4).  On February 22,

2007, Greenberg Traurig filed the present action alleging violations of federal and state antitrust

laws, intentional and knowing fraudulent conduct, violation of the Virginia Consumer Protection

Act ("VCPA"), common law conspiracy and statutory business conspiracy.  The Complaint was

filed on behalf of MAR, who seeks actual damages of at least $6 million, and seeks treble

---

motions, see Rogers v. Pittston Co., 800 F. Supp. 350, 355 (W.D. Va. 1992), WPI will make
these materials available for an in camera review if requested by the Court.

damages and attorney's fees under the antitrust laws, the Virginia business conspiracy statute, and the VCPA.

Among other things, the Complaint alleges that WPI has engaged in an unlawful conspiracy to violate the antitrust laws by charging supracompetitive prices for membership and other Resort services.  Specifically, the Complaint alleges the following:

- "In 1999, WPI entered into a written exclusive-dealing agreement with WREC and High Country Associates, LLC ("HCA"), a Delaware limited liability company, which gave WREC the exclusive right to have a real estate sales office in Wintergreen Resort in return for WREC's and HCA's selling, annually, $400,000 worth of memberships in WPI at prices which WPI maintained as supracompetitive levels… ."  (Compl. ¶ 2).

- "From WPI's point of view, the two illegal exclusive-dealing agreements have allowed WPI to maintain supracompetitive prices for memberships and annual fees… ."  (Compl. ¶ 6).

- "In addition, purchasers of real estate have been and are being coerced to purchase memberships in WPI."  (Compl. ¶ 10).

- "At no time has WPI articulated any procompetitive justification for or benefit from its exclusive-dealing agreements.  Coercing buyers to pay supracompetitive prices for WPI memberships is not a procompetitive benefit.  Nor is extracting supracompetitive prices for rental services.  Although, in theory, WPI should act for the benefit of its members who are property owners, agency effects have caused WPI to act in a manner contrary to the interests of Wintergreen property owners."  (Compl. ¶ 12).

- "WPI operates the Resort recreational, rental and commercial properties and other amenities.  Owners of property in the Resort whose property carries with it a 'Property Right of Membership' can become members of WPI by paying an activation fee and can enjoy the facilities by paying an annual fee.  Property owners whose property does not have a 'Property Right of Membership' can purchase that right, attach it to their property and, thereafter, activate their membership.  The activation of this membership is called the 'Premier Equity Membership.'  WPI represents to property owners that, when they sell their property, they will be able to obtain redemption of their membership at 80% of the then cost of activation (at the time of redemption).  In fact, however, the right of redemption is actually conditioned upon WPI's sale of four new memberships or the seller's securing a membership activation from his purchaser within 60 days of the sale/purchase."  (Compl. ¶ 25).

6

- "Since 2000, WPI has consistently increased (a) the cost of the 'Property Right of Membership,' (b) the fee to activate a membership and (c) the annual usage fee, without improving the benefits to members.  Typical of a monopolist, WPI has refused to reduce the price of memberships even as the number of memberships sold declines.  The following is a chart of the increases in cost of the Property Right of Membership, the 'activation fee' and the annual usage fee, and the resulting reduction in output:"

| Year | Property Right of Membership | Activation Fee | Annual Charge | Memberships Sold |
|------|------------------------------|----------------|---------------|------------------|
| 2001 | $12,500 | $5,500 | $870 | $   663,750 |
| 2002 | $12,500 | $14,000 | $2640 | $ 8,758,367 |
| 2003 | $12,500 | $15,000 | $2900 | $ 1,487,197 |
| 2004 | $13,000 | $16,000 | $3250 | $ 1,555,987 |
| 2005 | $13,500 | $17,000 | $3640 | $ 1,591,164 |
| 2006 | $14,000 | $17,000 | $4325 | |

(Compl. ¶ 26).

- "WPI's pressure on WRPP to sell memberships, rather than fulfill its duty exclusively to represent the sellers who have given it the listings, is apparent from one of the first WRPP listing summaries on the multiple listing service ('MLS') which states:  'Contracts including WPI membership activation strongly encouraged by owner.'  Discovery will reveal whether WRPP disclosed to the owner/seller the likelihood that urging a prospective buyer to include membership activation (currently priced at $17,000) in his offer would likely lower the offering price for the property, or whether WRPP has a financial interest in that activation fee, as WREC did.  (WREC received $1500 for every Property Right of Membership or activation sold.)"  (Compl. at 15 n.16).

- "WPI's attempt to rationalize the Second Exclusive Agreement as beneficial to property owners is false and misleading.  WRPP, like WREC before it, forecloses competition and, thereby, is providing fewer choices and reduced services at higher prices, and WPI continues to charge supracompetitive prices for its memberships and property rental services.  Moreover, even if the price of WPI memberships were at competitive levels, an obligation to sell memberships would not justify the exclusive-dealing arrangement because WPI can create incentives to sell memberships in much less restrictive ways."  (Compl. ¶ 33).

- "As set forth above, the illegal exclusive-dealing Agreements have injured the market and competition … by effectively causing locked-in buyer/purchasers to pay an increased total price to purchase real estate and coercing them to buy WPI memberships which they do not really want … [and] by effectively causing WPI member/consumers to pay supra-competitive prices for Property Rights of Memberships, activation fees and annual usage charges… ."  (Compl. ¶ 65).

7

I-757895.3

- "Thus, this is not a case of a property owner (WPI) using its property as it wishes but, rather, of a property owner entering into illegal exclusive-dealing agreements, foreclosing competition and coercing consumers into paying higher rates for, and having less choice in, real estate services, and forcing consumers to pay supracompetitive prices for memberships, activation fees and annual charges." (Compl. ¶ 65).

On April 5, 2007, Bob Ashton, the president of WPI, sent a letter to Mr. Hillier concerning this litigation and Mr. Hillier's prior advice. (Ashton Decl. ¶ 12, Ex. A). This letter expressed surprise and disappointment that Mr. Hillier's law firm filed litigation based upon facts which Mr. Hillier knew to be false (specifically, that the membership fees were based upon monopolistic goals as opposed to Mr. Hillier's advice). (Id.). Mr. Ashton requested that Mr. Hillier respond to the letter to discuss this advice and whether Mr. Hillier would stand behind the advice in this litigation. (Id.).

Shortly after receiving the letter, Mr. Hillier left a voice message for Mr. Ashton indicating that he would investigate the matter and speak with Mr. Ashton. (Id. ¶ 13). Thereafter, they spoke briefly, during which conversation Mr. Hillier expressed his surprise regarding the lawsuit, denied knowledge of the lawsuit, and indicated that he would be speaking with the firm's general counsel the following day. (Id.). Although Mr. Hillier stated that he would talk with Mr. Ashton again after this internal consultation, Mr. Hillier now refuses to speak with Mr. Ashton regarding this litigation or his advice. (Id. ¶¶ 13-14). Having heard nothing for weeks, Mr. Ashton wrote Mr. Hillier a second letter on May 2, 2007, again asking for Mr. Hillier's position. (Id. ¶ 14, Ex. B).

By letter dated May 4, 2007, C. Allen Foster, lead counsel for Greenberg Traurig, responded on Mr. Hillier's behalf. (Id. ¶ 15, Ex. C). Mr. Foster denied any conflict but then offered to amend the Complaint to remove any allegations regarding the membership fees. (Id.) Mr. Foster attached to his letter a proposed First Amended Complaint. (Id., Ex. D).

8

## II.     Greenberg Traurig Cannot Represent MAR Based Upon the Allegations in the Complaint

### A.     Standard for Disqualification

All members of the Virginia State Bar and all attorneys[4] admitted *pro hac vice* are subject to the Virginia Rules of Professional Conduct, set forth in part 6 of the Rules of the Supreme Court of Virginia.  See Va. Sup. Ct. Rules, pt. 6, § II (Preamble); id. pt. 6, § I(C)(3) ("A lawyer who provides services as authorized under this rule, or who is admitted *pro hac vice* under Rule 1A:4 shall, with regard to such services or admission, be bound by the disciplinary rules set forth in the Virginia Code of Professional Responsibility").  This Court has adopted the Virginia rules as its "disciplinary rules."  See Rule III(C)(1), Rule IV of the Rules of Court, Standing Orders, and Plans of the U.S. Dist. Ct. for the W.D. Va.; Tessier v. Plastic Surgery Specialists, Inc., 731 F. Supp. 724, 729 (E.D. Va. 1990) ("The Court is charged with the duty and responsibility of supervising the conduct of attorneys who appear before it").

The Fourth Circuit has held that in, "determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances 'with hair-splitting nicety' but, in the proper exercise of its supervisory power over the members of the bar and with the view of preventing 'the appearance of impropriety,' it is to resolve all doubts in favor of disqualification."  United States v. Clarkson, 567 F.2d 270, 273 n.3 (4th Cir. 1977).  A court should not "consider whether the motives of counsel in seeking to appear despite his conflict are pure or corrupt; in either case the disqualification is plain."  Id.  While the moving party bears a "high standard of proof" for disqualification, consistent with the other party's right to counsel of

---

[4]    The Complaint was filed by Geoffrey J. Greeves and Maria P. Logan, both members of the Virginia State Bar, and Mr. Foster, who has been admitted *pro hac vice*, all of whom are with Greenberg Traurig.  In addition to these individuals, MAR is represented by Garret G. Rasmussen of Orrick, Herrington & Sutcliffe, LLP, and Erik D. Bolog, also a member of the Virginia State Bar.

his choice, "the right of one to retain counsel of his choosing is 'secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar.'" <u>Tessier</u>, 731 F. Supp. at 729.

        B.      <u>Greenberg Traurig's Representation of MAR Violates Rules 1.9 and 1.10 of the Virginia Rules of Professional Conduct</u>

Greenberg Traurig's representation of MAR implicates Rule 1.9 and Rule 1.10 of the Rules of Professional Conduct.  Rule 1.9(a) states, "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless both the present and former client consent after consultation."  <u>Id.</u>  Rule 1.10(a) extends the prohibition to other members of the firm and provides, "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.6, 1.7, 1.9, or 2.10(e)."

Rules 1.9 and 1.10 are clear and unambiguous.  WPI is a former client of Mr. Hillier.  Pursuant to Rule 1.9(a), Mr. Hillier could not "represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless both the present and former client consent after consultation."  <u>Id.</u>  There is no question that MAR's interests are adverse to WPI's interests.  Therefore, under the plain language of this rule, if the subject matter of Mr. Hillier's advice to WPI is "substantially related" to this litigation, he could not personally represent MAR in this case.  Under Rule 1.10, that disqualification would be imputed to his firm, including Mr. Greeves, Ms. Logan, and Mr. Foster.

Courts have offered varying definitions of the phrase "substantially related" for determining whether conflicts exist in successive representation situations.  See Tessier, 731 F. Supp. at 730 (discussing various standards of substantial relatedness).  This Court described the test in Rogers v. Pittston Co., 800 F. Supp. 350, 353-54 (W.D. Va. 1992), aff'd, 996 F.2d 1212 (unpublished table decision), 1993 WL239001 (4th Cir. 1993), as follows:

> "Substantially related" has been interpreted to mean "identical" or "essentially the same."  In determining whether the two cases are "substantially related," the court must decide whether the attorney could reasonably have been exposed to client confidences in the former case.  "The substantial relationship test is not a rule of substantive law but a measure of the quantum of evidence required for proof of the existence of the professional obligation."  No actual receipt of confidences must be shown; such a standard would place an unreasonable burden on the moving party.  Where the matters are determined to be substantially related, and there was a reasonable chance that the attorney received confidences in the first matter, an irrebuttable presumption arises that confidences were exchanged.

Id. at 353-54 (citations omitted).  The ultimate issue to decide is "whether 'it could reasonably be said that during the former representation the attorney might have acquired information related to the subject matter of the subsequent representation.'"  Id. at 355; see also Tessier, 731 F. Supp. at 730 ("A lawyer may not represent an adversary of his former client if the subject matter of the two representations is 'substantially related,' which means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second'") (quoting Analytica, Inc. v. NPD Research, Inc., 708 F.2d 1263, 1266 (7th Cir. 1983)).

This Court applied the "identical" or "essentially the same" subject matter test in Rogers and disqualified an attorney based upon his former work as in-house counsel for one of the parties.  The plaintiffs in that case, the Pittston Company and Jewell Ridge Coal Corporation, brought a declaratory judgment action to determine whether they had breached covenants in two leases.  The defendants were individuals asserting certain rights under those leases.  The attorney in question had served as in-house counsel for Pittston.  During his tenure, he reviewed the leases

11

in order to interpret a "minimum royalty provision," which had nothing to do with the controversy before the Court.  The attorney also apparently had been copied on a document prepared by one of his colleagues, which did discuss one of the issues in the case.  Despite the fact that the attorney did not recall this document or anything related to client confidences about these leases, the Court disqualified the attorney.

The Court noted that, "[a]lthough Johnson only examined the minimum royalties issue, and no such issue is involved in the later cases, he could reasonably have had access to confidential information while reviewing the Rogers leases."  Id. at 354.  The Court also stated that it had "no doubt that Johnson testified truthfully to his lack of knowledge of any confidences.  Furthermore, this Court is convinced that Johnson has made every effort to ensure that he was acting in an ethical manner.  However, it is not for the court to consider 'whether the motives of counsel in seeking to appear despite his conflict are pure or corrupt; in either case the disqualification is plain.'"  Id. at 354-55 (quoting Clarkson, 567 F.2d at 273).

The Court also rejected the argument that disqualification was not proper because the attorney did not recall confidential information related to the document prepared by his colleague.  Id. at 354.  Even acknowledging these pure motives, the attorney's inability to recall any specific details of the various documents, and the lack of any ongoing dispute while the attorney was in-house counsel, the Court found disqualification to be proper noting that "[a]ll the Court must inquire is whether 'it could reasonably be said that during the former representation the attorney might have acquired information related to the subject matter of the subsequent representation.'"  Id. at 355.  Because the attorney might have acquired relevant information, he was disqualified.

The Fourth Circuit affirmed this decision in a per curiam opinion expressly finding that the matters were substantially related under the test applied by this Court.  See Rogers v. Pittston Coal Co., 996 F.2d 1212 (unpublished table decision), 1993 WL 239001 (4th Cir. 1993).

  C.  The Issues as Set Forth in the Complaint Are Substantially Related to the Advice Given by Mr. Hillier

  There can be little question that the current litigation is substantially related to Mr. Hillier's advice given to WPI.  Under the test adopted by this Court and affirmed by the Fourth Circuit, Mr. Hillier undoubtedly "might have acquired information related to the subject matter of the subsequent representation."  WPI provided Mr. Hillier with full access to WPI's documents and personnel.  This included confidential financial information relating to the Resort's performance, membership finances, and real estate transactions.  Mr. Hillier and his team conducted confidential interviews with all key personnel to ascertain financial and service issues that needed to be addressed (and produced a confidential memorandum detailing those conversations).  Mr. Hillier and his team interviewed representatives of WREC and HCA, both unnamed co-conspirators, as well as Bo Newell himself, regarding the membership program.

  Based upon this review of documentation and the interviews of WPI agents, Mr. Hillier provided specific planning advice on the fees to be charged by WPI.  He offered "recommendations" as to proposed changes in the membership structure and services, and a suggested plan for implementing and marketing these changes to existing and future owners. WPI relied upon this advice and, in fact, implemented the majority of changes suggested by Mr. Hillier.

  Greenberg Traurig is now challenging that advice and claiming that the membership practices and policies adopted by WPI are illegal and anticompetitive.  If correct, these

allegations would mean that Mr. Hillier committed malpractice in advising WPI.  This possibility, by itself, creates an insurmountable conflict.  Under Rule 1.9, this conflict can only be cured through the consent of both MAR and WPI, which will not be given.  Under Rule 1.10, this conflict is imputed to disqualify Greenberg Traurig as a firm.

          D.     <u>Greenberg Traurig's Representation Also Violates Rule 3.7</u>

          *1.     The Representation Violates Rule 3.7(c)*

Greenberg's representation of MAR also implicates Rule 3.7.  Rule 3.7 maintains the disciplinary rules general prohibition on attorneys acting both as advocates and witnesses in the same proceedings, except in limited circumstances.  The new rule, however, liberalizes the restrictions on attorneys who will be called to testify, as long as they are not litigating the matter.  This relaxation, however, remains subject to the conflict of interest rules under Rule 1.9.  Specifically, Rule 3.7(c) provides, "[a] lawyer may act as advocate in an adversarial proceeding in which another lawyer in the lawyer's firm is likely to be called as witness unless precluded from doing so by Rule 1.7 or 1.9."

The references to Rules 1.7 and 1.9 recognize that there may be circumstances in which an attorney's testimony creates a conflict of interest.  Comment 6 to Rule 3.7 explains this concern:

> Whether the combination of roles involves an improper conflict of interest with respect to the client is determined by Rule 1.7 or 1.9.  For example, if there is likely to be substantial conflict between the testimony of the client and that of the lawyer or a member of the lawyer's firm, the representation is improper.  The problem can arise whether the lawyer is called as a witness on behalf of the client or is called by the opposing party.  Where a lawyer may be called as a witness other than on behalf of the client, paragraph (b) allows the lawyer to continue representation until it becomes apparent that the testimony may be prejudicial to the client.  Determining whether or not such a conflict exists is primarily the responsibility of the lawyer involved.  <u>See</u> Comment to Rule 1.7.  If a lawyer who

14

is a member of a firm may not act as both advocate and witness by reason of conflict of interest, Rule 1.10 disqualifies the firm also.

Va. Sup. Ct. R., pt. 6, § II, Rule 3.7, comm. 6.  There is no question that Mr. Hillier's testimony regarding the basis for the membership fees would be "prejudicial to the client."  Accordingly, consent of WPI and MAR is required under Rule 1.9.

### 2.     *The Representation May Also Violate Rule 3.7(a)*

In addition to violating Rule 3.7(c), Greenberg Traurig's representation of MAR may also violate Rule 3.7(a) because of Mr. Foster's personal involvement and ownership interests in Wintergreen.  Rule 3.7(a) provides:

> A lawyer shall not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness except where:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.

Id.  The comments to Rule 3.7 explain the rationale behind the "witness-advocate" prohibition and, in particular, why it may prejudice the opposing party:

> The opposing party has proper objection where the combination of roles may prejudice that party's rights in the litigation.  A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others.  It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.

Id., comm. 2.

The Complaint and proposed amended complaint both allege harm to property owners generally and to certain property owners specifically.  In paragraph 42 of the Complaint (and paragraph 39 of the proposed amended complaint), MAR alleges:

I-757895.3

> Similarly, MAR offered superior service, holding regular open houses in the properties on which it secured listings. Open houses are important to both sellers and buyers because, in the case of sellers, they expose their properties to more potential buyers and increase demand and, in the case of buyers, they provide product and price comparisons. In contrast, WREC refused to hold regular open houses. When WREC's largest customer requested open houses for its properties, WREC refused to do so. Despite WREC's intransigence, this customer – which conducted millions of dollars of business through WREC – did not believe that it could afford to list with anyone other than WREC because of WREC's market power in the Resort.

The Complaint later calculates alleged injury to "consumer/buyers" and corresponding unjust enrichment to WREC based upon the failure to hold open houses. The Complaint alleges that this harm amounted to "approximately $4.5 million of improperly received commissions." (Compl. ¶ 68).

In paragraph 46 of the Complaint (and paragraph 43 of the proposed amended complaint), MAR again alleges specific harm to WREC's "largest customer":

> Despite MAR's lower commissions, the First Exclusive Agreement allowed WREC to maintain its supracompetitive commission structure. Indeed, when WREC's largest customer requested reduced commissions based upon volume, that request was summarily denied and the customer was specifically told that, if it didn't like the WREC commission structure, it could go elsewhere. Of course, WREC knew that the customer could not go elsewhere, and the customer did not go elsewhere.

As with open houses, MAR has calculated alleged harm/unjust enrichment based upon these claimed supracompetitive commissions. The Complaint alleges harm based upon supracompetitive commissions to be $2,637,367. (Compl. ¶ 67).

Upon information and belief, the "largest customer" referenced in these allegations is Mr. Foster (either individually or through entities he owns in whole or in part). Based upon the information available to WPI, Mr. Foster or his related entities have owned at certain times over 30 properties at Wintergreen, although his current holdings appear to be less.

I-757895.3

If this is correct, and WPI believes that it is, this is not a situation of a lawyer discovering during litigation that he may be a witness.  To the contrary, Mr. Foster would have specifically pleaded himself into the litigation as the most knowledgeable property owner.  His testimony would be relevant to all of MAR's causes of action.

For example, MAR relies heavily upon the individual feelings of property owners about the exclusive lease provisions it has alleged to support its foreclosure argument.  MAR repeatedly claims that even though property owners were aware of other alternatives, they did not feel they could use those alternatives because of WREC's and WRPP's market power.  The evidence of this, of course, is the claimed experience of the "largest customer."  If anyone could use his clout to break the alleged monopolistic hold, surely it would be WREC's largest customer.  MAR claims this customer's inability to use other realtors proves foreclosure and is evidence of a specific act in furtherance of its conspiracy theories.

Additionally, the testimony of all property owners would be relevant to MAR's VCPA claim.  Even accepting MAR's dubious argument on standing, in order to prove the VCPA claim, MAR has to show misrepresentations made to consumers,[5] reliance by those consumers, and resulting damage.  Certainly, the largest customer is a necessary witness to establish that claim. That customer will be identified in discovery and deposed.  If that customer is, in fact, Mr. Foster, he cannot go before the jury as a witness and testify as to fraudulent representations (requiring clear and convincing proof) and reliance, and then argue his own credibility as an advocate.  This would severely prejudice all of the Defendants.  Under these circumstances, if

---

[5]  WPI maintains, as it did in its motion to dismiss briefs, that MAR does not have standing to sue under the VCPA for fraud allegedly perpetrated on others.  WPI simply points out that, even under MAR's theory, Mr. Foster's testimony is necessary and clearly was foreseeable.

Mr. Foster is the "largest customer," which WPI believes is correct, Mr. Foster cannot continue this representation.

## III.  This Conflict Cannot Be Cured by Erecting a "Screen" from Mr. Hillier

In his letter of May 4, 2007, Mr. Foster argues that a "screen" between himself and Mr. Hillier can be imposed to address any potential conflict.  This argument ignores the plain language of Rule 1.9(a), which states that a conflict under the rule can only be cured by consent of the former client (i.e., WPI).  The Virginia State Bar explained this principle in a recent legal ethics opinion:

> The fact that Attorney B has not reviewed the file would be relevant if Rule 1.9 conflicts could be "cured" by development of a screen for Attorney B regarding this matter.  However, Rule 1.9 does not permit a screen to "cure" a conflict triggered by the rule; only consent from the former client can provide that "cure" and allow the representation.  Therefore, the Committee opines that Attorney B's lack of familiarity with the file is insufficient to remove this situation from the reach of Rule 1.9.

LEO 1806 (2004).

## IV.  The Fact that Mr. Hillier Was Not a Member of Greenberg Traurig at the Time of the Initial Representation Is Irrelevant.

Mr. Foster's letter also suggests that Mr. Hillier's prior association with Hillier & Associates somehow nullifies the current conflict.  The Virginia State Bar also has rejected this argument:

> In this fourth factor is also the suggestion that because Attorney B was not at the firm at the time of Attorney A's representation of the purchasers, the potential conflict should not be imputed to Attorney B.  That suggestion could only be based on a misreading of Rule 1.10(a), which, to review, operates in the present scenario as follows:  Attorney A would have a potential conflict of interest were he to represent the landowner suing his three former clients; accordingly, if Attorney A cannot represent the new clients, neither could any other attorney associated in a firm with Attorney A, including Attorney B.  Thus, whether Attorney B was present at the firm at the time of the first representation at issue is

not part of the analysis; what is important is that Attorney A and Attorney B are in the same firm at the time of the *new* representation.

Id. (Emphasis in original).

## V.     The Proposed Amended Complaint Cannot Cure the Conflict

Although Greenberg Traurig denies a conflict exists, its offer to amend the Complaint to remove the allegations regarding WPI's memberships is a telling admission that such a conflict does, in fact, exist.  Moreover, the proposed amended complaint cannot cure the conflict because (1) the test is whether Mr. Hillier might have acquired confidential information relevant to the subsequent representation; (2) the membership issue is inextricably intertwined in the causes of action asserted by MAR; and (3) WPI still cannot discuss this matter with Mr. Hillier.

### A.     Whether a Conflict Exists Depends upon the Information that *Mr. Hillier* Might Have Acquired in the Prior Representation

The Virginia Rules of Professional Conduct are designed to prevent even the appearance of impropriety.  Rule 1.9 reflects that goal by prohibiting successive representations of adverse clients where the attorney in the first representation, Mr. Hillier, was provided access to information relevant in the second action.  As explained by this Court in Rogers, "[a]ll the Court must inquire is whether 'it could reasonably be said that during the former representation the attorney might have acquired information related to the subject matter of the subsequent representation.'" Id. at 355.

Mr. Hillier advised WPI during the period of time in which WREC occupied space in the Mountain Inn.  He was provided with access to all relevant information regarding WPI's real estate programs.  His report specifically references WREC, HCA, and MAR as the leading competitors in the real estate market.  Hillier & Associates interviewed representatives from all

three entities for the purpose of advising WPI.  He discussed his findings and recommendations with the WPI staff.  His report addressed numerous issues facing WPI, including how to meet WPI's funding needs.  He gave recommendations on meeting funding goals and included projections based upon his recommendations.  Mr. Hillier also evaluated the rental program and was provided access to all information related to that program.

Even as amended, the complaint raises issues which Mr. Hillier could have learned, and indeed did learn, about in his representation of WPI.  The proposed amended complaint still asserts causes of action for antitrust violations, common law and business conspiracies, and alleged violations of the VCPA.  The antitrust claims necessarily require an analysis of any procompetitive justifications for WPI's actions.  These claims also necessarily require an analysis of WPI's real estate programs, including its rental program, and financial status – all areas investigated by Mr. Hillier.

MAR has admitted in its brief in opposition to the Defendants' Motions to Dismiss that the conspiracy actions can only survive if the Defendants conspired to accomplish some criminal or unlawful purpose or some lawful purpose by criminal or unlawful means.  MAR also acknowledged that there can be no conspiracy to do what the law allows.  With respect to its business conspiracy claims, MAR must also prove that the Defendants acted "intentionally, purposefully and without lawful justification."

MAR claims that the various conspiracies were directed at MAR specifically.  Mr. Hillier, however, spoke with a number of alleged conspirators and would have acquired information directly related to WPI's motives in addressing its financial concerns.  Mr. Hillier would have relevant knowledge about WPI's "intent," which is a necessary element in each of these claims.

I-757895.3

Mr. Hillier also would have knowledge directly related to MAR's VCPA claim.  As discussed more fully in the motion to dismiss briefs, this claim requires proof of common law fraud, including misrepresentations, fraudulent intent, reliance, and damages.  Whether this claim involves "resort services," as alleged in the Complaint (and the proposed amended complaint), or real estate services as urged by MAR in its briefs, the Court cannot ignore the fact that Mr. Hillier was given access to information related to this claim.  Mr. Hillier conducted a full investigation of WPI's resort services and its real estate programs.  He or members of his team interviewed the department heads for each service and program.  At the very least, Hillier & Associates was exposed to information that might be relevant in this litigation.  That exposure is all that is required to mandate disqualification.

B.     The WPI Membership Issue Is Intertwined With the Antitrust and Conspiracy Allegations

The Complaint unequivocally alleges that part of the antitrust violations and conspiracies concerned WPI's handling of its memberships.  The Complaint alleges both direct harm by forcing owners to pay supracompetitive fees, and indirect harm by raising the overall cost to purchase real estate at the Resort.  The proposed amended complaint, however, pretends that these allegations were not made and that the membership issue can be removed from consideration.  This not only ignores reality, but also ignores the basis of the consumer complaints upon which MAR relies.

Both the Complaint and the proposed amended complaint rely heavily upon a petition circulated by MAR in which owners expressed their concern regarding WPI's agreement with Roy Wheeler.  MAR's own communications state that WPI entered this agreement for "in an

effort to sell more WPI memberships."  MAR included this claim in the form email sent to
owners asking them to sign the petition:

> Friends/Wintergreen Owners:  Most of you have probably heard the recent news
> from the WPI Board at Wintergreen.  If not, you probably will before long.  In
> short, the board has hired Roy Wheeler Realty Company out of Charlottesville to
> serve as what they call their "in-house" realtor - *in an effort to sell more WPI
> memberships.*

(See Ex. 2 to Compl.) (emphasis added).  Along with each of these emails, MAR sent out the
petition repeatedly referenced in the Complaint and proposed amended complaint that MAR
alleges has been signed by nearly 1,000 property owners.  Among other things, the petition
states:

> [T]he restriction on competition hurts purchasers by reducing the number of
> agents with whom they may realistically work, makes their visiting available
> properties more difficult, *subjects them to pressure to purchase WPI memberships
> which both increases the total price and thereby makes purchasers reduce their
> offers for the property itself and lessens the opportunities for (and increases the
> cost of) rentals of purchased properties.*

(See Ex. 2 to Compl.).

MAR also attached as Exhibit 2 to the Complaint numerous responses to this email and
comments sent along with signed petitions.  The proposed amended complaint likewise
references the same exhibit.  The vast majority of these petitions do not contain substantive
comments.  Of the ones that do, however, the comments focused largely on the membership
program, and, in particular, its cost.  The following are excerpts from these comments:

- "It turns off someone like me enough to hesitate to purchase my Property Right of
  Membership to have for enhancing future sales value.  You really should focus
  more on the structure/benefits of the membership programs particularly for those
  without children or for those one-activity (i.e., ski or golf or tennis) or occasional-
  use members who find it is much more cost-effective to pay full price per activity
  than to pay dues plus activity fee at a small discount."

- "If the point is to sell more WPI memberships, then what needs to happen is the
  membership structure, benefits, and pricing need to be revisited.  The membership

does not make economic sense for most people, especially if they are not full time residents at Wintergreen."

- "Purchasing WPI membership can be iffy.  When we purchased here 4 years ago, I wanted to join WPI, but since I was not an avid golfer I was unable to make either to my wife or to myself any valid economic argument for joining WPI.  So we did not.  Good decision, we saved the initiation dues plus the yearly dues.  Had I purchased a WPI membership I doubt that I would now get the 80% refund of the current membership amount, since I doubt that our buyer will join WPI.  Thus, even that 'investment' argument does not work."

- "WE DO NOT belong to WPI.  Let Us tell you why.  We have continuously analyzed joining WPI, and have come to the conclusion over and over again, that the advantages vs the costs are not there. . . This is the reason that you are having problems selling the Premier Memberships, not that the other Real Estate companies are not selling them.  WPI is too costly for the benefits received."

- "It's a shame that WPI is blaming competitive real estate brokers for the flat performance of the Premier Equity memberships.  We decided not to take part in that gold-plated program because it seemed to be structured as a money-making rather than a cooperative venture, and it offered us even less than we had under the former program."

- "The claim is made that other realtors were not encouraging membership.  I have three comments on that.  A.  It was one of the first things mentioned when we started to look at property on the mountain.  B.  Membership is probably not economically reasonable for owners who only spend a relatively small amount of time here.  C.  Last night I discovered that you are offering coupons that allow one to play golf for less than what it costs me to pay as a partner, so if your primary interest is golf and you spend less than a quarter of the year here, why become a member at all?  (I don't ski, but it wouldn't surprise me to find this also is less expensive for non-partners)."

- "Apparently, a major reason for the Board's decision was to promote aggressively the sale of Premier Equity Membership.  In this regard I note a comment by Bo Newell in his letter of 5 October 2006, wherein he stated that 'The real problem is the cost of membership versus its benefits….'"

- "My other concern is that to my knowledge I have never received any information about the inability of WPI to resale memberships.  If these memberships are 'piling up' and not being resold, they do not have the value we have been led to believe.  Perceived value is different from what Buyers are willing to pay."

- "Simply put, the annual cost of the Premier Equity membership has become out of line with the benefit/value of the membership."

23

- "Rather, WPI needs to reach out to the real estate community and see how to best market WPI membership in a way that benefits both buyers and sellers."

- "By the way, the WPI costs and memberships have been outrageous the last 2 years.  We know several people who bought up there recently and chose not to do the program because of cost vs. usage."

- "In our experience, at least, the decision to purchase or not to purchase a premier equity membership (which we understand to have been somehow implicated in your decision) had nothing to do with any advice from our realtor."

- "I'd like to add my thoughts on WPI membership.  Maybe people aren't buying WPI memberships because the program isn't attractive to most people?  I think the Board needs to take a step back and look at why the WPI memberships aren't selling.  I don't agree with the assessment that real estate agents and companies aren't promoting it, but rather the underlying fundamentals of the program don't appeal to the masses."

- "If the board wanted to consider a 'IN HOUSE' realtor, that's one thing, (although it is ALL about selling WPI MEMBERSHIPS) but to totally try and block out the local firms and remove all their literature is getting out of hand!"

- "In fact I wonder why WPI believes it needs to be involved in the real estate market at all.  I know they want more residents to join WPI and I believe that more should.  However, that should be done by making WPI membership more attractive for those residents not members."

- "Does the Board believe that this is a magic pill that will automatically get home buyers to join WPI?  Because that is what the letter implies.  Public Opinion of Real Estate Agents is one step above 'used car salesman.'  If a prospective buyer feels pressured to join WPI they will run."

- "If they wish to sell more WPI memberships, they should lower the prices of their memberships, so that folks think it is worth the expense to purchase them."

- "I have read the attached Petition to WPI Board of Directors and agree with the petition wholeheartedly.  As the owner of a unit in the rental program, I definitely do not find there to be a return on investment from WPI membership.  Certainly, I do not use the facilities enough to warrant the expense."

- "We also want to comment to the board that an open market is not a threat to a viable market commodity.  The reason WPI memberships are not selling well is that they are bad values for anyone who is not very active skiing and/or golfing AND has a large family."

- "Yes--I have read the petition and agree.  We live at 142 Saddle Ridge Lane in Stoney Creek.  We are not active members of the WPI and would consider joining but only after major revisions are made to the membership criteria."

(See Ex. 5, collected from Compl. Ex. 2).

As these documents make clear, MAR has taken the position that the membership issue is the driving force in what it claims is an anticompetitive agreement with Roy Wheeler.  It circulated an email making that claim and a petition making that claim.  Presumably, MAR intends to call property owners to testify about the damage generated by the WPI membership requirements.  From all indications, MAR certainly intends to introduce these petitions to justify its claims.  In fact, in a second letter also sent out on May 4, 2007, Mr. Foster included initial documents requests specifically asking for documents related to all WPI memberships sold since 1999.  (See Ex. 6, Nos. 5 and 7).

Because MAR is taking this position, WPI must defend itself accordingly.  This necessarily includes providing the justification for the membership program that Mr. Hillier recommended and helped implement.

C.      WPI Cannot Consult With Mr. Hillier While Greenberg Traurig Is Representing MAR

The allegations contained in the Complaint and proposed amended complaint call into question the advice provided by Mr. Hillier.  WPI has repeatedly attempted to talk with Mr. Hillier concerning this litigation, but without success.  Whenever a deal, transaction, or advice comes under fire, the first response of every client is to talk with attorney who represented the client in the deal or transaction or provided the advice.  This is particularly true when a third party has alleged that the client violated the law by following the lawyer's advice.  It is essential that the client be able to discuss the matter with the lawyer to determine why the advice was

25

given, why the lawyer believed the advice was correct when given, whether the lawyer still believes the advice is correct, and what course of action the client should take in responding to the litigation.

Under the present circumstances, WPI cannot have these conversations with Mr. Hillier while his firm is representing MAR.  Rule 4.2 of the Rules of Professional Conduct states that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."  Additionally, as long as the attorney-client relationship exists between MAR and Greenberg Traurig, Mr. Hillier, as a member of the firm, cannot actively advise WPI, MAR's opposing party, regarding the litigation.  This would be a direct violation of Rule 1.7.

## VI.    MAR Will Not Be Prejudiced by the Disqualification

Ignoring its own culpability in taking on this representation, Greenberg Traurig argues that a disqualification would result in prejudice to MAR.  Greenberg Traurig offers no support for this position, which cannot possibly be correct.  This case is not set for trial until March 2008.  Discovery has not begun, and the parties have not even exchanged initial disclosures. Additionally, MAR is being represented by multiple lawyers from multiple firms.  One of these attorneys, Garrett Rasmussen, is one of the leading antitrust lawyers in America.  (See Mr. Rasmussen's on-line biography attached as Ex. 7).  There is no indication that Mr. Rasmussen and Mr. Bolog, also a leading trial attorney in his area, cannot continue this litigation without a moment's hesitation.  Unlike many cases of disqualification, these attorneys have been involved in the litigation even before it was filed and are fully aware of the issues.  Under these

circumstances, MAR simply cannot show the substantial prejudice necessary to overcome disqualification.

## Conclusion

WPI does not bring this motion lightly.  Because of the magnitude of the allegations and the advice given by Mr. Hillier, however, WPI has no alternative.  The Rules of Professional Conduct are clear in this regard.  Because the current litigation is substantially related to the prior representation and the continued representation of MAR would otherwise violate Rule 3.7, Greenberg Traurig must be disqualified.

WHEREFORE, WPI respectfully requests that the Court grants its Motion to Disqualify Greenberg Traurig LLP and grant WPI such other and further relief as the Court deems just and proper.

WINTERGREEN PARTNERS, INC.,


By:         */s/ Conrad M. Shumadine*
           Conrad M. Shumadine (VSB #4325)
           Michael R. Katchmark (VSB # 40440)
           Brett A. Spain (VSB # 44567)
           WILLCOX & SAVAGE, P.C.
           One Commercial Place, Suite 1800
           Norfolk, Virginia 23510
           Telephone:  757-628-5500
           Facsimile:  757-628-5566
           cshumadine@wilsav.com

           Dewey B. Morris (VSB #5739)
           THOMPSON MCMULLAN, P.C.
           100 Shockoe Slip
           Richmond, Virginia  23219
           Telephone:  804-698-6225
           Facsimile:  804-780-1813
           dbmorris@t-mlaw.com

           *Attorneys for Wintergreen Partners, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2007, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

> Geoffrey J. Greeves, Esq.
> Greenberg Traurig LLP
> 800 Connecticut Avenue, N.W.
> Washington, DC 20006

And I further certify that I will mail the foregoing document by first class mail, postage prepaid,

to the following non-filing users:

> C. Allen Foster, Esq.
> Greenberg Traurig LLP
> 800 Connecticut Avenue, N.W.
> Washington, DC 20006
> Maria P. Logan, Esq.
> Greenberg Traurig LLP
> 1750 Tysons Blvd., Suite 1200
> McLean, VA 22101
>
> Garret Rasmussen, Esq.
> Orrick, Herrington & Sutcliffe, LLP
> Suite 200 Washington Harbor
> 3050 K Street, N.W.
> Washington, DC 20007
>
> Erik D. Bolog, Esq.
> 6701 Democracy Blvd., Suite 515
> Bethesda, MD 20817

                                        */s/ Conrad M. Shumadine*
                                        Conrad M. Shumadine