**MOUNTAIN AREA REALTY, INC.,** )
**2788-B Rockfish Valley Highway** )
**Nellysford, VA  22958** )
　　　　　　　　　　**Plaintiff,** )
　　　**v.** )　　　　　　　**Civil Action No. 3:07cv00016**
　　　　　　　　　　　　　　)
**WINTERGREEN PARTNERS, INC.** )
**Mountain Inn, Devil's Knob** )　　　**JURY TRIAL DEMANDED**
**Wintergreen Resort, VA  22958** )
　　　　　　　　　　　　　　)
**Serve**: )
**Registered Agent** )
**Daniel F. Schabein** )
**Wintergreen Partners, Inc.** )
**P.O. Box 706** )
**Wintergreen, VA  22958** )
　　　　　　　　　　　　　　)
**and** )
　　　　　　　　　　　　　　)
**ROY WHEELER REALTY CO.,** )
**1100 Dryden Lane** )
**Charlottesville, VA  22903** )
　　　　　　　　　　　　　　)
**Serve**: )
**Registered Agent** )
**Richard E. Carter** )
**414 Park Street** )
**Charlottesville, VA  22902** )
　　　　　　　　　　　　　　)
**and** )
　　　　　　　　　　　　　　)
**Robert S. Ashton** )
**472 Cedar Meadow Drive** )
**Nellysford, VA  22958-8064** )
　　　　　　　　　　　　　　)
**and** )
　　　　　　　　　　　　　　)
**Lloyd W. Williams** )
**Mountain Inn, Devil's Knob** )
**Wintergreen Resort, VA  22958** )
　　　　　　　　　　　　　　)
**and** )

**Leland S. Kollmorgen**              )
**105 Saddleback Knoll**           )
**Nellysford, VA  22958,**         )
_____ **Defendants.**   )

## AMENDED COMPLAINT

1.  Plaintiff Mountain Area Realty, Inc. ("MAR") brings this action against Wintergreen Partners, Inc., a Virginia non-stock corporation ("WPI"), Roy Wheeler Realty Co., a Virginia corporation ("RWRE"), Robert S. Ashton ("Ashton"), Lloyd W. Williams ("Williams") and Leland S. Kollmorgen ("Kollmorgen") for violations of the Sherman Antitrust Act, violations of the Virginia Antitrust and Consumer Protection Acts and conspiracy.   Plaintiff is seeking damages from WPI resulting from two exclusive  contracts.  The first was with Wintergreen Real Estate Company ("WREC") which ran from 1999-2005.[1]   The second is with RWRE which started in 2006 and is still in effect.  MAR is seeking damages and injunctive relief against RWRE as well as against WPI.

## SUMMARY

2.  As set forth in more detail below, WPI, a non-stock membership corporation doing business as a club, owns and operates the resort, recreational, retail, conference and restaurant facilities in Wintergreen Resort ("the Resort") which is located in  Nelson County, Virginia.  The relevant antitrust markets are the markets for (i) real estate sales and (ii) property rentals in the Resort.  There are no reasonably interchangeable substitutes for the Resort since there are no other large resort areas in the surrounding region offering similar amenities, there are significantly higher sales commissions in the Resort as compared to Nelson County, and

---

[1] WREC has acknowledged the anticompetitive effects of the exclusive dealing contracts and is now urging WPI to cease using them; accordingly, MAR has not now named WREC as a defendant in this action.

consumers for Resort services are highly inelastic. In the alternative, there is a market for real estate services and property rentals in Nelson County as a whole.

3. In 1999, WPI entered into an exclusive agreement with WREC and High Country Associates, LLC ("HCA"), a Delaware limited liability company, which gave WREC the exclusive right to have a real estate sales office in Wintergreen Resort in return for WREC's and HCA's selling, annually, $400,000 worth of memberships in WPI (the "First Exclusive Agreement"). [2] *See* Exhibit 1 attached to original Complaint. It was WPI's, WREC's and HCA's intention, through this illegal First Exclusive Agreement, to restrain competition for the resales of Resort properties to the detriment of consumers and the market as a whole. After the termination of the First Exclusive Agreement, on August 31, 2006, WPI announced a second exclusive agreement (the "Second Exclusive Agreement") with Defendant RWRE, which is doing business as Wintergreen Resort Premier Properties ("WRPP"). Thereafter, RWRE/WRPP's market share sharply increased, and will soon reach the same high level that WREC achieved when it was the beneficiary of the exclusive contract, because of the foreclosure effects of the exclusive contract.

4. Because of the illegal exclusive agreements, competition has been restrained by the exclusion of rivals, resulting in higher real estate commissions and reduced services to consumers. As a result, from 1999 until 2005, WREC market share at the Resort averaged approximately 68% and WREC was consistently able to foreclose from competition a large portion of the Resort market, and only a slightly lower portion of the market in Nelson County

---

[2] At no time did WPI or WREC reveal their mutual interest in either the real estate office or the sale of memberships. WREC's failure to reveal these interests violates the Realtor Code of Ethics and the regulations of the Virginia Department of Professional and Occupational Regulations. ***Code of Ethics and Standards of Practice***, Preamble, Articles 1, 2, 6, 7, 11, and 12 (2006); 18 VAC §§ 135-20-260(10) and (11); 135-20-300(4).

as a whole. Resort property sales account for approximately 78% of the value of all sales in Nelson County (computed over the last four years).

5. The illegal First Exclusive Agreement enabled WREC to exercise market power in both the Resort and in Nelson County and to charge supracompetitive listing and sales commissions. In particular, WREC was able to charge a 6-7% commission on homes and condominiums and a 10% commission on land, while the competitive market commission rates were 5-5 ½% on homes and condominiums and 6-8% on land. These supracompetitive commission rates represented a 20% premium over competitive rates and are sufficient, by themselves, to demonstrate injury to competition.

6. WREC's market power, derived from the First Exclusive Agreement, also allowed WREC, and now allows WRPP, to withhold standard real estate services for resale properties, such as regular open houses, extensive advertising of resale properties in newspapers and real estate publications and professionally designed sales brochures.

7. From WPI's point of view, the illegal exclusive agreements have allowed WPI to maintain a supracompetitive 50% commission on the rental of Resort properties owned by others, while the competitive market commission was 25%. In order to have a viable Resort rental program, a real estate agent must be able to deliver the keys to the rental unit (and other Resort information) to the renter in a convenient way. Because the First Exclusive Agreement excluded all other real estate agents from the Resort except WREC, only WREC was in a position to have a viable program in competition with WPI. By agreement, express or tacit, WREC did not compete with WPI in the rental of Resort properties, thereby assuring WPI of market power in that market.

8.   On or about October 31, 2005, WPI terminated WREC's illegal exclusive rights. Thereafter, in 2006, WREC's market share of real estate resales at the Resort dropped from 68% to 29% and it is continuing to drop.  Indeed, the difference in WREC's market shares during and after the First Exclusive Agreement reflects the *minimum* foreclosure effects that are attributable to the First Exclusive Agreement.  Thus, on average, the First Exclusive Agreement foreclosed at least 39% of the market for Resort-property resales from competitors like MAR, and the Second Exclusive Agreement is now having a comparable foreclosure effect.

9.   The Second Exclusive Agreement, which is now in effect, is even more anticompetitive than the First Exclusive Agreement in that it precludes any other real estate firm from being listed on the Resort web site or from having brochures or other marketing materials on Resort property.  WPI trumpeted that this exclusive deal gave RWRE the "only real estate office" on Resort properties as well as  "the exclusive rights to advertise on the resort website," the exclusive right to display real estate literature of any kind in the Resort, and "first dibs on potential clients visiting the resort."  It advised buyers and sellers that dealing with the "only official real estate firm of Wintergreen Resort" would give them the "advantages of being *on the inside*" (emphasis in the original).

10. Since the announcement and the opening of the RWRE/WRPP office in the Resort, RWRE's market share has been increasing at an accelerating rate, which it could not have achieved under normal competitive conditions.   Indeed, RWRE is now  actively soliciting agents from other firms, including MAR.  Several realtors associated with competing firms have already left their firms to join WRPP.  Most telling, of the five firms other than WRPP which provide any significant real estate services in the Resort, three have closed, or are in the process of closing, their Nelson County offices because they cannot compete with the RWRE monopoly.

11. In total, the cumulative effects of the WREC and RWRE Exclusive Agreements have imposed losses of nearly $6,000,000 upon MAR due to higher costs, lost sales, and reduced productivity and efficiency.[3]  Indeed, it was only during the interim lag-period between the WREC and RWRE Exclusive Agreements (*i.e.,* October 2005 to August 2006) that MAR was able to gain any market share in the Resort at all.  During that lag period, MAR's share of Resort-property resales promptly increased roughly 80%.  Since the WRPP Exclusive Agreement went into effect in August 2006, however, MAR's market share in the Resort has once again plummeted, further demonstrating the foreclosure effects that are directly attributable to the exclusivity.

12. The Second Exclusive Agreement will cause even greater injury to MAR and to consumers.  Indeed, numerous property owners at the Resort have taken it upon themselves personally to express their opposition to the illegal Second Exclusive dealing Agreement.  In addition, a petition, describing the illegal and anticompetitive effects of the First Exclusive Agreement and the Second Exclusive Agreement, has been circulated among them, and nearly 1,000 have signed the petition, many of whom have appended personal comments objecting to the harm to consumers and to the market caused by the First Agreement and the Second Agreement.  *See* composite Exhibit 2, attached to original Complaint.  Because of the market power created by the exclusive agreements, however, those property owners remain locked-in to WRPP as a practical matter.

13. At no time has WPI articulated any procompetitive justification for or benefit from its exclusive agreements.[4]  Although WRPP has been able to maintain supracompetitive prices

---

[3] These damages are computed for 2003-6.
[4] The only excuse that WPI and RWRE or WRPP have been able to offer is that they "have leveled the playing field."  To the contrary, as WPI openly advertises, the illegal Agreements have resulted in one firm (first WREC and, now, WRPP) having "first dibs" on every potential purchaser of Resort property.  Sellers, who are keen market

through the exclusive contracts, that is *not* a procompetitive benefit. WPI's right to allocate leasing space to chosen vendors and to control the aesthetics of the Resort is, similarly, *not* a procompetitive justification sufficient to overcome the persistent foreclosure effects wrought by the exclusive contracts. Indeed, as discussed in more detail below, it appears that WPI is motivated largely by a byproduct of the exclusive contracts that permits WPI to charge supracompetitive prices for its Resort-property rentals program.

14. As a practical matter, injured property owners who are members of WPI have no effective remedy within WPI due to the dominance of Defendants Ashton, Williams and Kollmorgen, who have simply ignored the owners' calls for greater competition in the Resort real-estate market. In addition, most Resort-property sellers who have paid higher commissions and received reduced real estate services are no longer members of WPI and, thus, could have no remedy within that organization.

## JURISDICTION AND VENUE

15. MAR's complaint arises under the antitrust laws of the United States, 15 U.S.C. §§ 1, 2, 15, 26, and the common and statutory law of Virginia. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367 and 15 U.S.C. §§ 1, 2, 15, and 26.

16. Venue is proper pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d).

17. Defendants advertise in, send marketing materials and agents into, transact business in interstate commerce and are found within this judicial district. MAR's claims arise in part within this district, and Defendants' unlawful conduct has harmed commerce in this district. The

---

observers, see this monopoly on potential purchasers and list their property with the exclusive firm (*see* paragraph 30, *infra*). As a result, it is especially disingenuous to say that this is a "level playing field."

interstate trade and commerce described herein is and has been carried out in part within this district.

**PARTIES**

18. Plaintiff MAR is a Virginia corporation with its principal place of business at 2788-B Rockfish Valley Highway, Nellysford, Nelson County, Virginia 22958. MAR provides real estate services, including resale services for homes, condominiums, lots and raw land, in Nelson County, Virginia, and attempts to provide such services in Wintergreen Resort.

19. Defendant WPI is a non-stock Virginia corporation with its principal place of business at Mountain Inn, Devil's Knob, Wintergreen Resort, Virginia 22958.

20. Defendant RWRE is a Virginia corporation with its principal place of business at 1100 Dryden Lane, Charlottesville, Virginia 22903.

21. Defendant Ashton is a citizen and resident of Wintergreen Resort, Nelson County, Virginia, and is, and has been during all material times, the President and chief executive officer of WPI. Ashton was the ultimate controlling actor who designed, negotiated and executed the illegal agreements and is personally liable for all the damages suffered thereby. Defendant Ashton maintains an office in the WPI offices in Mountain Inn.

22. Defendant Williams is the Vice President-Marketing of WPI. Defendant Kollmorgen was the Chairman of the Board of Directors of WPI. As to the Second illegal Exclusive Agreement between WPI and RWRE, Williams and Kollmorgen were, along with Ashton, controlling actors who designed and negotiated the illegal exclusive agreement, and who, along with Ashton, signed a letter to MAR and other realtors announcing the Second Exclusive Agreement and barring MAR's marketing materials from Resort property. See Exhibit 3 attached to original Complaint. Williams and Kollmorgen are personally liable for all the

8

damages suffered thereby.  Defendant Williams maintains an office in the WPI offices in Mountain Inn.  Defendant Kollmorgen resides at 105 Saddleback Knoll, Nellysford, VA 22958.

## FACTS

### Background

23. In 1974, a group of Virginia investors conceived of a family oriented, four seasons, golf, skiing and vacation resort in Nelson County in the mountains of central Virginia. Operating under a succession of entities which ultimately became Wintergreen Development, Inc. ("WDI")[5], they purchased property which now comprises approximately 11,000 acres on Devil's Knob Mountain, Black Rock Mountain and Crawford's Knob, and in Nellysford in the valley below.  They permanently dedicated approximately 5000 acres, mostly on Crawford's Knob, as open space, and proceeded to build ski slopes (ultimately 23) , golf courses (ultimately 45 holes), tennis courts and other recreational amenities and to develop the remaining property into lots (approximately 2425) for single family homes and tracts for condominiums and townhomes (approximately 1180), installing roads, water and sewer and electric service and facilities for police and fire protection.

24. WDI built a commercial center in the mountaintop resort called "Mountain Inn," where non-property owning visitors to the Resort check in at a Reception desk, and maintained an Orientation Center across from the Reception desk.  Mountain Inn is the gateway to all the ski slopes, shops, conference facilities, rental properties and restaurants of the Resort.  WDI's in-house sales agents[6] had an office in Mountain Inn but that building also contains approximately

---

[5] For convenience, the entire chain of entities which successively owned the Resort is referred to throughout as WDI.

[6] WDI's in house sales department was known as Wintergreen Real Estate Co.  As set forth below, when WREC was formed in 1999, it took the name of that unincorporated division of WDI and, pursuant to the First Exclusive Agreement, occupied the Orientation Center as its sales office.

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 9 of 36   Pageid#: 533

40,000 sq. ft. of commercial and conference space, much of which is leased to unrelated tenants or is vacant. Significantly, there is ample vacant space to accommodate other real estate companies.

25. All amenities and facilities at the Resort are, and always have been, open to the public. Approximately 100,000 - 190,000 non-property owning visitors use the Resort each year (depending on the quality of the ski season). Visitors to the Resort are, by far, the principal source of sales "leads," and ultimately consummated real estate transactions, with regard to resales of Resort property. After the First Exclusive Agreement went into effect, WPI personnel at the reception desk uniformly referred all real estate inquiries to the WREC office across from the Reception desk. In 1984, a group of investors purchased the Resort recreational and commercial properties and other amenities, including Mountain Inn, through WPI. WPI operates the Resort recreational, rental and commercial properties and other amenities. WDI retained, and continued to sell, the Resort development properties.[7]

26. Wintergreen is the only resort of its type within Nelson County and, because of the special consumer demand for its property, it constitutes an antitrust market in and of itself.

### The First Exclusive Agreement

27. On November 28, 1999, WPI entered into the First Exclusive Agreement with WREC.[8] Pursuant to that Agreement, WREC became the only real estate firm with an office in

---

[7] By the late 1990's, the development properties were substantially "sold out" and declining sales and mismanagement caused WDI to seek bankruptcy protection. In 1999, the Bank, which was the largest and only significant secured creditor of WDI, sold the remaining developable property to High Country Associates, LLC ("HCA") which was 80% owned by four of the then-existing sales agents of the Wintergreen Real Estate division of WDI -- Richard C. Carroll, Timothy C. Hess, Peter V. Farley and Kyle T. Lynn (together with WREC and HCA, the "Unnamed Co-conspirators"). At the same time, the Unnamed Co-conspirators incorporated WREC (using the name of the previous in-house sales division of WDI) as a real estate firm to market the properties owned by HCA and to handle resales of previously sold Resort properties.
[8] HCA is also a party to the contract. HCA is a limited liability company which is 80% owned by the owners of WREC. HCA is dominated and controlled by WREC. Contractual obligations that applied to WREC also applied to HCA.

the Resort, and WPI agreed to prohibit any other real estate company from leasing sales office space in the Resort, conditioned upon WREC/HCA's generating for WPI no less than $400,000 net annually from the sale of Property Rights of Membership and activation fees with regard to properties sold by WREC/HCA. The First Exclusive Agreement also provided WREC/HCA with the right to lease the former Orientation Center in Mountain Inn (across from the Reception desk) for five years, with a five year option to renew.[9] Until October 31, 2005, WREC had a real estate office in that space in Mountain Inn, directly astride the principal route for each and every person at the Resort to access all the ski slopes, retail shops, rental properties, conference facilities and principal restaurants of the Resort.

28. The First Exclusive Agreement gave WREC market power in the Wintergreen Resort and Nelson County real estate resales markets, foreclosing rival real estate companies from a substantial portion of the market and preventing them from achieving economies of scale.

29. WREC's market power is evidenced by its market share:

| Year | WREC's Market Share of Resales in the Resort | WREC's Market Share of Resales in Nelson County (Including the Resort) |
| --- | --- | --- |
| 2000 | 66% | 44% |
| 2001 | 68% | 49% |
| 2002 | 68% | 53% |
| 2003 | 75% | 61% |
| 2004 | 70% | 56% |
| 2005 | 66% | 52% |

---

[9] Throughout, WREC, in the exercise of its dominion and control over HCA, has caused HCA to allow WREC to have and enjoy all the benefits of that lease.

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 11 of 36   Pageid#: 535

| 2006 | 45%[10] | 31%[11] | |
|------|---------|---------|--|

30. Unfortunately for consumers, competitors and the market, there were considerable barriers to entry protecting WREC's monopoly power. For example, even if MAR developed a relationship with an existing property owner, when that property owner was interested in selling his property, he or she frequently listed it with WREC because of the universal perception that the illegal First Exclusive Agreement gave WREC significant market power with respect to access to clients for Resort resales and was, therefore, in the most advantageous position to secure a purchaser for such property. Thus, while the First Exclusive Agreement may not have, literally, required consumers to deal only with WREC, the effect of the First Exclusive Agreement was just that. WREC's market share of Resort listings reflects its market power, as set forth below:

| Year | WREC's Market Share of Listings in the Resort |
|------|-----------------------------------------------|
| 2000 | 59% |
| 2001 | 57% |
| 2002 | 63% |
| 2003 | 66% |
| 2004 | 66% |
| 2005 | 66% |
| 2006 | 62% |
| 2007(est) | 29% |

[10] WREC's market share decline after the expiration of the First Exclusive Contract was cushioned by existing listings. WREC's market share at the resort has now fallen to approximately 29% and is declining, as a result of WRPP's having "first dibs" on all potential purchasers.

[11] The decline in WREC's market share is totally accounted for by the loss of its exclusive rights under the illegal exclusive dealing Agreement.

WREC's market power with respect to resort listings was caused by the First Exclusive
Agreement with WPI.   The substantial share of exclusive listings that WREC held in the Resort
demonstrates the foreclosure effect of the First Exclusive Agreement. Significantly, WREC's
share of exclusive listings in Nelson County (outside the Resort) were always substantially lower
than inside the Resort, further evidencing substantial the foreclosure effect of the First Exclusive
Agreement.

31. The Second Exclusive Agreement which established  RWRE/WRPP as "the resort's
official on-site real estate firm,"  is even more  restrictive and anticompetitive than the  First
Exclusive Agreement.  In addition to giving RWRE/WRPP the exclusive right to have a real
estate office at the resort, the Second Exclusive Agreement  makes  RWRE/WRPP the only
realtor on the Resort's web site, and it prohibits all other real estate firms from displaying any
marketing materials on Resort property.  Since the Second Exclusive Agreement, RWRE (doing
business as WRPP) has risen dramatically from 0% of the market to an accelerating growth rate
that is on track to reach the same levels that WREC had earlier obtained.  Again, WPI has
granted this illegal exclusivity in return for RWRE "pushing" the sales of Property Rights of
Membership and membership activations and its rental program[12] and, for the first time, a "cut"
of the monopoly profits.  And, again, the exclusivity will have significant foreclosure effect
comparable to that of the First Exclusive Agreement, garnering and shielding at least 40% of the
market from competitors such as MAR.

32. Pursuant to the Second Exclusive Agreement, WPI has, as a practical matter, forced
property owners to deal with WRPP.  In press releases, letters and advertisements, WPI tells

---

[12]      WPI's pressure on WRPP to sell memberships, rather than fulfill its duty exclusively to represent the sellers
who have given it the listings, is apparent from one of the first WRPP listing summaries on the multiple listing
service ("MLS") which states: "Contracts including WPI membership activation strongly encouraged by owner."

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 13 of 36   Pageid#: 537

property owners that WRPP is the Resort's only "official on-site real estate firm," has the "advantages of being *on the inside*" (emphasis in the original) which, according to WPI, "will work for you [because], as the only real estate firm with a physical presence on WPI's resort property, your property will receive enhanced exposure to hundreds of thousands of resort guests and visitors to our website."[13]  In terms even more  anticompetitive than the First Exclusive Agreement, WPI now prohibits other real estate firms from "hav[ing] offices or marketing materials on resort property" and, in the place where MAR and other local realtors previously placed their brochures and advertising materials, WPI has placed a "kiosk that is immediately to your right when entering the lobby of the Mountain Inn" where  WRPP agents "will also provide real estate services and information . . . ."  In sum, as WPI describes the relationship, "the resort's resources will be focused on our official on-site real estate firm, Wintergreen Resort Premier Properties [RWRE's trade name]."  The fact that WPI would make these claims is evidence that the Second Exclusive Agreement is having a significant foreclosure.

        33. The Second Exclusive Agreement, like the First Exclusive Agreement before it, forecloses competition and, thus, results in fewer choices and reduced services at higher prices.

        34. The Second Exclusive Agreement, like the First Exclusive Agreement, was awarded without competitive bidding or even any pretense of competition.  Indeed, WPI was so supremely confident of the market power generated by the illegal Second Exclusive Agreement that it selected for its chosen beneficiary a Charlottesville realtor, RWRE, who had no office, and did virtually no business, in Nelson County, and who obviously could not service Nelson County

_____

Discovery will reveal whether WRPP has a financial interest in that activation fee, as WREC did. (WREC received $1500 for every Property Right of Membership or activation sold.)
[13] WPI does not even attempt to explain how a single real estate office could possibly offer "more exposure" for a seller's property than multiple firms engaged in vigorous competition within the Resort.

or Wintergreen Resort with the same knowledge, quality and efficiency that could have been obtained from an established Nelson County realtor such as MAR.

35. Although the Second Exclusive Agreement has only been in effect since September, 2006, WRPP has secured a virtual monopoly on the attention of prospective purchasers for Resort real estate, even when those persons are existing property owners, and has secured a large proportion of the new listings of homes, condominiums and lots in the Resort. Its exclusive listings, when mature, represent a reasonable approximation of the foreclosure effect of the Second Exclusive Agreement.

36. As mentioned earlier, WREC has acknowledged the anticompetitive effect of the Second Exclusive Agreement by mailing the petition complaining about the new monopoly to its clients, expressly stating that WREC agrees with the petition's recitation of the harm to consumers and the market![14] Specifically, WREC wrote: "There is no doubt that [the exclusive dealing agreement between WPI and RWRE] will negatively affect *all* homeowners **for the reasons stated in the attached [petition].**" (emphasis added) Exhibit 4 attached to original Complaint. The attached petition describes in detail the harm to consumers caused by both the First Exclusive Agreement and the Second Exclusive Agreement: "We believe that this restraint of competition harms sellers of Wintergreen properties by making it more difficult to sell, keeping properties on the market longer, reducing the quality of real estate services, increasing

---

[14] At least one property owner has recognized the hypocrisy of WREC's change of heart, and wrote the following: "[Y]ou and others associated with Wintergreen Real Estate benefited for many years from the exclusive non-compete nature of your operation at Wintergreen. * * * During that time your company charged any and all sellers a Seven (7%) commission, you had offices right in the middle of the development and no one was allowed to lease space to compete. In fact, your company sued Mountain Area Realty when it first opened for business, did it not? You had reserved parking spaces granted no one else. * * * All of the actions of your company "restrained competition and harmed sellers." Now that the shoe is on the other foot you wish to cry FOUL and have all of the homeowners believe you have had and continue to have all of our best interests at heart. WHO THE HELL ARE YOU KIDDING? I know nothing about this new agreement nor anything about the new company, but I do know you and your partners have been feeding at the trough too long. I think it is incredible hubris for you to cry foul." *See* Exhibit 5 attached to original Complaint.

commissions that must be paid and reducing the net sales price realized. In addition, the restriction on competition hurts purchasers by reducing the number of agents with whom they may realistically work, makes their visiting available properties more difficult, subjects them to pressure to purchase WPI memberships which both increases the total price and thereby makes purchasers reduce their offers for the property itself and lessens the opportunities " *See* Exhibit 4 attached to original Complaint (emphasis in the original).

## The Plaintiff's Injury

### Background

37. In 1996, Robert R. ("Bo") Newell, who was then employed by WDI as a real estate salesman (and co-Sales Manager), left WDI and formed his own real estate company under the name Wintergreen Area Realty. He incorporated his company, printed signs, offices supplies and marketing materials and began to advertise his business. WPI, however, illegally claimed a proprietary interest in the name "Wintergreen" (a place name which cannot be proprietary to anyone) and threatened Mr. Newell with a lawsuit if he did not cease and desist from using the name he had chosen. Unable to afford litigation, Newell changed his business name to Plaintiff MAR. On information and belief (*see* footnote 14), WPI took that action against him at the instigation of WREC.

38. Sometime after he formed MAR, Newell was joined in the business by his wife, Nancy Hernandez (who had also been a real estate salesperson at WDI), and, subsequently, by her son, Benjamin Hernandez, the two of whom also have an ownership interest in MAR.

39. Since 1996, MAR has attempted to compete for the resale of Resort properties but has never obtained more than a 28% market share and its market share declined steadily during the term of the First Exclusive Agreement. This decline has taken place because of Defendants'

16

unlawful conduct and despite MAR's best efforts to develop and utilize alternative means of competition.

40. Only in 2006, when the WREC Exclusive Agreement expired, was MAR able to increase its market share for Resort-property resales. During the interim period before the RWRE Exclusive Agreement, MAR's share of Resort sales increased by 80% from 15% to 27% and was continuing to rise until WRPP secured the WRPP Exclusive Agreement in August 2006. The rise in MAR's market shares in the absence of an exclusive firm at the Resort further highlights the foreclosure effects of the WREC and WRPP Exclusive Agreements. Since WRPP's opening of its exclusive office in the Resort, MAR's market share in the Resort has again declined.

41. In its attempt to compete against the illegal exclusive agreements, MAR adopted every alternative means of competition it could devise. For example, MAR offered lower commissions -- 6-8% (compared to 10% charged by WREC) on land and 5-5 ½% (compared to 6-7% charged by WREC) on homes and condominiums. Despite the lower total commission, MAR offered a full 3% (4% on land) cooperative commission to the selling agency. Despite lower commissions and other competitive efforts, however, during the term of the WREC exclusive agreement, MAR's market share continually declined.

42. At all relevant times, MAR offered superior service, holding regular open houses in the properties on which it secured listings. Open houses are important to both sellers and buyers because, in the case of sellers, they expose their properties to more potential buyers and increase demand[15] and, in the case of buyers, they provide product and price comparisons. In contrast, WREC refused to hold regular open houses. When WREC's largest customer requested open

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 17 of 36   Pageid#: 541

houses for its properties, WREC refused to do so. Despite WREC's intransigence, this customer -- which conducted millions of dollars of business through WREC -- did not believe that it could afford to list with anyone other than WREC because of WREC's market power in the Resort.

43. MAR's superior services also included extensive advertising in the market, a state-of-the-art website, preparation of color brochures and other promotional literature and extensive advertising[16] which promoted the Resort and memberships in WPI.[17] In contrast, WREC's substantial market power allowed it to skimp on advertising and promotion for resale properties[18] and otherwise to ignore the interests of consumers and the market in promoting the Resort.

44. Despite increasing marketing and promotion expense virtually every year, MAR's market share declined shortly after the First Exclusive Agreement took effect and new listings started to shift to WREC. The following chart sets forth MAR's market share in Wintergreen Resort:

---

[15] In normal markets, open houses assist sellers in securing offers and reduce the time their property is on the market. In "red hot" markets, such as existed in 2004-2005, open houses contribute to the number of offers, including stimulating bidding wars which result in contracts in excess of the listing price.

[16] The following is a chart of MAR's expenditures on advertising and promotion which, on information and belief, exceeded WREC's expenditures for advertising and promotion during the respective time periods, despite the fact that WREC's market share was, at all relevant times, approximately three times MAR's market share:

| Year | MAR Advertising and Promotion Expense |
|------|----------------------------------------|
| 2000 | $161,306 |
| 2001 | $159,385 |
| 2002 | $176,213 |
| 2003 | $193,511 |
| 2004 | $215,813 |
| 2005 | $248,960 |
| 2006 (thru 10/17) | $200,810 |

[17] MAR also engaged in internet advertising on its web site but such advertising has not been effective to sell real estate. MAR's experience during the first illegal exclusive dealing Agreement proves beyond peradventure that this alternative method of competition is wholly inadequate to counter the exclusive firm's market power and monopoly position.

[18] In contrast to MAR's promotion of resales, WREC regularly advertised only its own and HCA's properties.

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 18 of 36   Pageid#: 542

| Year | MAR's Market Share of Resales in Nelson Country (Excluding the Resort) | MAR's Market Share of Resales in the Resort |
|---|---|---|
| 2001 | 29% | 26%[19] |
| 2002 | 26% | 28% |
| 2003 | 23% | 19% |
| 2004 | 21% | 20% |
| 2005 | 22% | 15% |
| 2006 | 25% | 27% |

45. MAR's market share of resales and exclusive listings in the Resort, compared to WREC's market share, dramatically demonstrates the market power and the foreclosure effect conveyed by the First Exclusive Agreement. As new competitors entered the market in 2003 - 2005, their market share came entirely from MAR, while WREC's market share, insulated by the exclusive agreements, was unchanged. Only in 2006, when WREC lost its monopoly, was MAR able to increase its market share as compared to both WREC and other competitors. In 2006, after WREC lost its exclusivity and before the Second Exclusive Agreement started to take effect, MAR's share of the Resort sales jumped to 27%.

46. Despite MAR's lower commissions, the First Exclusive Agreement allowed WREC to maintain its supracompetitive commission structure. Indeed, when WREC's largest customer requested reduced commissions based upon volume, that request was summarily denied and the customer was specifically told that, if it didn't like the WREC commission structure, it could go elsewhere. Of course, WREC knew that the customer could not go elsewhere, and the customer

---

[19] There was a lag time before the effects of the First Exclusive-Dealing Agreement fully appeared. The lag time essentially reflects the run-off of pre-contract listings plus the time between a new listing and a sale. Thus, the effects of the First Exclusive Dealing Agreement were not fully apparent until 2003.

did not go elsewhere. Thus, while there was no literal foreclosure provision in the agreement, the effect of the First Exclusive Agreement was to foreclose competitors. Indeed, WREC required customers to provide it exclusive listing privileges, thus effectively preventing competition from MAR and others for those customers.

47. Because of WREC's market position and the resulting perception that any real estate agent would have an easier time achieving a superior commission income, MAR was perpetually faced with the loss of associated agents. As a result, it had to offer its agents annual bonuses and superior percentage commission payouts. MAR believes that its bonuses and commission payouts are substantially in excess of any paid by WREC. Thus, WREC's conduct substantially increased MAR's (and other competitors') costs of competing, making them less effective and productive.

48. Indeed, despite all its efforts, MAR could not effectively compete against WREC's monopoly. Typical of the harm MAR suffered is the following email (attached as Exhibit 6 to original Complaint) from a property owner with whom MAR had a personal relationship:

"[A]lthough we LOVE working with you, we are listing our home with Wintergreen Real Estate. We feel that a lot of people look at homes during a fun weekend of skiing without ever having planned to do so. We feel these people are more likely to approach Wintergreen b/c they are on the top of the mountain and are probably referred to more by the Mountain Inn etc. We are just trying to make the best decision to sell our home the fastest . . . ." (capitals in the original)[20]

49. WREC's market power and the foreclosure effect of its exclusive contract are dramatically demonstrated by the fact that, after losing its exclusivity, WREC's market shares

---

[20] This email was written on February 9, 2006, after WREC lost its sales office in Mountain Inn but while it still had the exclusive right to be "on the mountain."

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 20 of 36   Pageid#: 544

for both resales and exclusive listings fell by approximately one-third and continue to decline, while MAR's market share was sharply rising, at least until WRPP secured the Second Exclusive Agreement.

## OTHER ANTICOMPETITIVE PRACTICES BY WPI AND WREC
## IN FURTHERANCE OF THE CONSPIRACY AND MONOPOLY

50. As part of its attempt to develop alternative means of competition in the face of the monopoly power created by WPI's illegal exclusive agreements, MAR owned and maintained unit 1411 in the Highlands condominium complex. It advertised it as being for sale (and it was) and conducted open houses in it. Unit 1411 also served as a place where MAR brokers and agents could meet potential purchasers and establish business relationships with them. WREC would not tolerate even this meager attempt at competition. With WPI's knowing consent, WREC induced the Board of Directors of the Highlands condominium to allow WREC's attorney, Stuart Sadler, who serves as both WPI's and WREC's attorney, to prepare a letter to MAR, open copy to Sadler, trumping up a purported violation of the condominium governing documents and threatening legal action. The letter sought to give the impression of due process for MAR, inviting it to a "hearing" on WPI's premises where MAR could "be heard on this violation," but it conclusively demonstrated the "kangaroo court" nature of the offered hearing when it notified MAR that "upon conclusion of this hearing, if the cars of your guests or invitees trespass on our lot, they will be towed" and, "if you continue this use of Unit 1411, we will file suit . . . ." A copy of this letter was attached as Exhibit 7 to original Complaint. Unable to afford protracted litigation, MAR was forced to agree that it would only use Unit 1411 on weekends, thereby substantially limiting its value as a competitive tool.

51. WREC continued to employ Sadler to harass MAR in order to cripple its competitive efforts. First, when MAR sought to use a map of the mountain portion of the Resort to

demonstrate to potential customers the location of resale properties, Sadler claimed that WREC had a copyright and proprietary interest in the map.[21]  In order to avoid litigation, however baseless, MAR was forced to recreate the map from scratch.  Subsequently, in 2006, Sadler complained about MAR's use of a map of the Stoney Creek area of the Resort which had been in constant use by all real estate agents in Nelson County for a decade,[22] saying that WREC had a proprietary interest in it.  Again, in order to avoid litigation, MAR was forced to prepare its own map from the original property survey.

52. Similarly, when MAR developed a state-of-the-art web site as an attempt to compete against the WPI-WREC illegal exclusive dealing Agreement, WREC hired a Washington intellectual property lawyer to threaten MAR with legal action if it used the words "Wintergreen Real Estate" in any of the key words on the site.  A friend of Newell's who was an attorney advised him that the claim was feckless but, being unable to afford litigation over each and every attempt he made to compete, Newell agreed not to capitalize "Real Estate" on the web site, which limited the value of the web site as a competitive tool.

53. Because of the market power created by the First Exclusive Agreement, WREC consistently refused to reveal to its clients the listings of any other real estate firms.  On numerous occasions, at MAR open houses, MAR agents have met potential purchasers who commented that "we've been working with WREC [who would not tell them about MAR open houses or take them to one] and are interested in a property like this, but no one ever told us it was listed." Withholding information about listings held by other real estate companies injures

---

[21] In fact, the map had been copyrighted in 1993 by WDI and, on information and belief, no assignment of that copyright, by operation of law or otherwise, had ever been made to WREC.
[22] When Newell went into independent business in 1996, he requested from WDI, and received, copies of the Stoney Creek map.  When his supply was exhausted, he copied the map and he and new entrants into the Resort resales market used the map, without complaint from WDI, from that time on.  Again, on information and belief, WREC has no copyright or proprietary interest in the map by assignment, operation of law or otherwise.  The map itself reflects a copyright held by  "Wintergreen," which is a place name, not a business entity.

22

consumers and competition and violates WREC's contractual obligations and fiduciary duties to its clients.

54. Further, throughout all relevant times, WREC breached its regulatory, fiduciary and contractual obligations to its clients by not allowing their MLS-listed properties to appear on the web sites of other real estate agencies, all as part of its intent and actions to maintain its market power and monopoly.

55. Further, on information and belief, the WREC principals instruct their associated agents not to reveal or sell the listings of other realtors. On one occasion of which MAR is aware, clients of MAR had listed their Stoney Creek home with MAR but it was not being shown by WREC agents. The sellers saw a WREC principal and asked why WREC agents were not showing the house. The WREC principal replied, "You've got it listed with the wrong people; we'll never show your house so long as it is listed with Mountain Area Realty."[23] Moreover, WREC required its customers to list exclusively with WREC, thus foreclosing competitors such as MAR from competing at all with respect to those customers.

56. All of the foregoing actions were anticompetitive and were possible only because the effects and intent of the illegal exclusive agreements was to exclude rivals and unreasonably restrain trade.

## THE ILLEGAL EXCLUSIVE AGREEMENTS GAVE
## WPI A MONOPOLY ON RESORT RENTALS

57. WPI's unlawful conduct not only resulted in overcharges to consumers seeking to sell their property, but also to consumers seeking to rent their property.

---

[23] He went on to slander MAR's business reputation by saying that MAR "doesn't know what they are doing." Such conduct violates the Realtor Code of Ethics and injures consumers and competition. Such conduct was only possible as a result of the illegal exclusive dealing Agreement

58. Many owners of property in the Resort hold their properties for investment and desire to rent them to help defray the cost of ownership and to produce a return on their investment. The business of managing those rentals is a lucrative one and the exclusive-dealing agreements unreasonably restrained trade in that market as well. As set forth above, the exclusive-dealing agreements foreclosed real estate agents other than WREC (now, WRPP) from having an office on Resort property, particularly in Mountain Inn, which is essential to conducting a rental operation. Moreover, upon information and belief, in conjunction with the illegal exclusive-dealing agreements, WPI agreed, WREC and WRPP agreed either expressly or impliedly, to refrain from competing with WPI in Resort property rentals.

59. On information and belief, as a result of the illegal exclusive agreements and the foreclosure of competition, WPI has consistently had a market share in Resort rentals in excess of 60%. As a result of this market power, WPI's rental program is characterized by high one-time charges to enroll (which discourage switching to a competitive service), supracompetitive commission rates (50% of gross rentals,[24] whereas the competitive market commission rate is 25%), excessive charges and numerous mechanisms which discourage or prevent competitive entry. WPI precludes any competitor or potential competitor from meeting tenants or delivering keys to units on Resort property. As a result of this last factor alone, it is practically impossible for anyone to compete with WPI's rental program.

60. Moreover, pursuant to the Second Exclusive-Dealing Agreement, WPI has used WRPP to expand its rental program monopoly. A recent listing states: "And, these slope-side units are in high demand as rentals - consider the rental program as a way to reduce your cost of ownership."

---

[24]     The rental commission is thirty percent on houses, but the homeowner has to provide the cleaning service. WPI's rental program includes a very small number of houses as opposed to condominiums and townhouses.

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 24 of 36   Pageid#: 548

61. Since the First Exclusive Agreement was entered into in 1999, WPI's net commission revenues from its rental program have been as follows:

| Year | WPI Net Rental Commission Revenues |
|------|-----------------------------------|
| 2001[25] | $3,900,021 |
| 2002 | $4,052,883 |
| 2003 | $3,648,727 |
| 2004 | $3,756,986 |

On information and belief, all of the competitors' net rental revenue from the Resort properties listed by them is miniscule.

62. Because of the foreclosure effects created by the exclusive agreements and the side agreements with WREC and RWRE, WPI has been able to subject property owners to unreasonable and disadvantageous terms. For example, participants in the WPI rental program are not allowed to participate in competitive rental programs (the WPI inspectors and cleaning crews check to see if there are signs of occupancy by tenants referred by competitors). The fee for entry into the WPI program is high -- $1000 (there is no fee to enter any of the competitive programs), and nonrefundable. WPI offers no discount for placing multiple properties in the program.

63. WPI also exacts supracompetitive prices for services connected to the rental program. For example, if WPI determines that there is some problem with a unit -- whether as small as the absence of a potholder (WPI charges the unit owner for items that *its renters* break or steal) or as large as a water leak -- WPI just fixes it and sends the owner a bill, often without even contacting the owner (even when there is a contact, there is no practical alternative for a non-resident

owner). The prices for these services are supracompetitive, frequently exorbitant, particularly in light of the fact that WPI charges an annual maintenance charge of $300 in addition to the specific charges for services and supplies. Similarly, WPI charges $36.00 per month for telephone service to each rental unit, even though that service is provided through its switchboard at no marginal cost. Similarly, WPI charges $36.00 per month for cable TV service to each rental unit, a price which far exceeds its marginal cost. Further, WPI forces every participant to provide high-speed DSL service to the unit and charges $19.95 per month, even though, on information and belief, it obtains the service in bulk for a fraction of the charge and despite the fact that few of the units even have the connections to allow use of the service.

64. Owners frequently complain about all these aspects of the WPI program but, because of the monopoly power resulting from the exclusive dealing agreements and side agreements with WREC and RWRE, WPI has no need to respond or change, and it hasn't.

## INJURY TO CONSUMERS AND TO COMPETITION

65. As set forth above, the First and Second Exclusive Agreements have injured competition in the relevant markets--the Resort and Nelson County, respectively:

- by foreclosing competition among real estate companies at the Resort ;

- by giving buyer/consumers less choice in their real estate purchases;

- by effectively causing locked-in buyer/purchasers to pay more to purchase real estate;

- by giving seller/consumers less choice in real estate services;

- by effectively causing locked-in seller/consumers to pay supracompetitive rates for real estate services;

---

[25] WPI did not begin separately to report net income from its rental program until its FY 2002 financial statements, which contain the prior year's figures as well.

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 26 of 36   Pageid#: 550

- by making it more difficult for seller/consumers to sell their properties and causing seller/consumers to wait longer for their properties to be sold; and

all in the relevant markets.

Thus, this is not a case of a property owner (WPI) using its property as it wishes but, rather, of a property owner entering into illegal exclusive agreements, foreclosing competition and coercing consumers into paying higher rates for, and having less choice in, real estate services.[26]

66. Similarly, the WPI monopoly on resort rentals has injured competition in both the Resort and in Nelson County:

- by foreclosing competition among real estate companies;

- by effectively causing locked-in consumer/renters to pay higher prices for rentals than they would in a competitive market;

- by limiting the choices of consumer/renters;

- by effectively causing consumer/property owners to obtain fewer rentals and lower net rental income than they would in a competitive market; and

- by effectively causing consumer/property owners to pay supracompetitive prices for services required by WPI,

67. In particular, the harm to seller/consumers (and the parallel unjust enrichment of WREC) caused by the supracompetitive commissions which seller/consumers have paid WREC is computed as follows. The total sales by WREC from the inception of the illegal exclusive dealing agreement to the termination of the First Exclusive Agreement is $352,825,087. The

---

[26] And, under the Second illegal exclusive dealing Agreement, a "cut" of the supracompetitive listing and sales commissions.

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 27 of 36   Pageid#: 551

average commission charged by WREC is 6.3960%,[27] compared to the average commission of 5.6485% in a competitive market.[28]  The difference of .7475% is multiplied by WREC's total sales, for a total supracompetitive profit of $2,637,367.

68. In addition, the harm to buyer/consumers (and the parallel unjust enrichment of WREC) caused by WREC's failure to offer standard real estate services, such as regular open houses, is computed as follows.  Open houses are an expense to a real estate company and its agents, because the time expended in holding open houses could otherwise be profitably used to secure additional listings and sales.  MAR estimates that each of its agents spent at least eight hours per week on open houses, or approximately 20% of their time.  Assuming that time spent on open houses would have been proportionally successful in securing listings and sales, approximately 20 of the sales of a firm which does not hold open houses is attributable to that economic benefit.  As a result, during the period of the illegal exclusive dealing Agreement, WREC was unjustly enriched by approximately $70 million in sales which, at their average commission rate of 6.3960, resulted in approximately $4.5 million of improperly received commissions. The unjust enrichment to WREC is an appropriate measure of the harm to consumer/buyers and, as a result, consumer/buyers have been further injured in the amount of at least $4.5 million.[29]

---

[27] This computation utilizes 6% as the WREC commission on houses and condominiums.  In fact, in most transactions during the computation period, WREC's commission was 7% but Plaintiff did not have the detailed transaction-by-transaction information necessary to use 7% on the applicable transactions.  After discovery, an exact computation can be made and, as a result, the damages will be substantially higher.

[28] It is notable that, when WREC charged a 7% commission rate on its listings, it gave cooperating brokers who actually produced the sale for the property only 3%, keeping 4% for itself.  Similarly, when MAR offered competitive listing commissions of 5 ½%, it was forced to give a full 3% to the selling broker, keeping only 2 ½% for itself.  Thus, the foregoing computation of WREC's overcharges is conservative because it relies upon average commission rates (using 6% on houses and condominiums, not the 7% WREC frequently charged) not the actual, even larger, supracompetitive portion WREC arrogated to itself.

[29] This calculation does not include the additional harm to consumers resulting from their properties being on the market longer and not being exposed to all potential purchasers, both of which were caused by WREC's failure to hold regular open houses.

69. Similarly, the foreclosure effect of the exclusive agreements and the related side agreements has harmed the consumers in the WPI rental program by causing them to pay supracompetitive commissions to WPI (which, in turn, constitute unjust enrichment of WPI). On the conservative assumption that, in a competitive market, the other resort rental firms would obtain 50% of the market enjoyed by WPI and would charge only a 25% commission, instead of WPI's 50% commission, then half the rental commission income realized by WPI since the inception of the illegal exclusive dealing Agreement constitutes unjust enrichment to WPI and harm to consumers. Using only the figures for 2001 and thereafter, the harm to consumers and unjust enrichment of WPI totals $ 7,679,309.

70. In addition, the illegal exclusive agreements have harmed competitors, particularly MAR. MAR lost commission income as a result of the foreclosure effect of the illegal exclusive-dealing Agreements and the resulting monopoly to WREC, and now to RWRE. The following is a chart of the respective market share and sales of WREC and MAR in Wintergreen Resort from the inception of the First Exclusive Agreement through 2005, including the respective market shares in 2006 when WREC lost its exclusivity and when, tellingly, its market share plummeted, as shown in the following table:

| Year | WREC Sales | WREC Resort Market Share | MAR Sales | MAR Resort Market Share |
|------|-----------|--------------------------|-----------|-------------------------|
| 2000 | $ 24,890,925 | 66% | $ 9,574,250 | 25% |
| 2001 | $ 28,590,827 | 66% | $ 10,922,733 | 26% |
| 2002 | $ 40,788,214 | 73% | $ 16,834,380 | 28% |
| 2003 | $ 61,232,309 | 75% | $ 15,825,081 | 19% |
| 2004 | $ 89,614,976 | 70% | $ 25,906,100 | 20% |

29

| | | | | |
|---|---|---|---|---|
| 2005E[30] | $ 107,707,836 | 66% | $ 24,875,749 | 15% |
| 2006E[31] | $ 38,297,944 | 45% | $ 21,588,400 | 27% |

71. On the conservative assumption that WREC's market share in a competitive market would have been 30% and MAR's would have been 45%, and assuming a competitive commission structure of 8% on land and 5 ½% on homes and condominiums (a weighted average commission of 5.6485),[32] MAR's commissions lost as a result of the illegal exclusive dealing Agreement are as follows:[33]

On the selling side: $114,114,762 times 3% = $3,442,872

On the listing side: $85,715,275 times 2.6485% = $2,270,169[34]

Thus, MAR's total lost commissions as a result of the illegal agreement between WPI and WREC is $5,713,041.

## COUNT I
### (Sherman Act § 1)
### (Against all Defendants)

72. MAR realleges and incorporates by reference each and every allegation set forth above.

73. Both the First Exclusive Agreement and the Second Exclusive Agreement are agreements that unreasonably restrain trade.

---

[30] WREC's 2005 sales are estimated by taking the actual deed transfers for Nelson County properties and comparing them to those properties shown as sold in MLS. The MLS sales attributed to WREC were added to the Wintergreen Resort sales not listed in MLS because of WREC's anticompetitive practice in that regard and because all other realtors include all their listings in MLS.

[31] WREC 2006 sales (through October 15) are estimated using the same methodology as set forth in footnote 30.

[32] From 2000-2004, WREC's sales consisted of 90.1% homes and condominiums and 9.9% land.

[33] The total volume of Wintergreen Resort sales was determined for each year, and totaled for the last four years, and then multiplied by .45. From that was subtracted the total volume of MAR sales in the Wintergreen Resort for the last four years. That difference is reported above and multiplied by 3%, the seller's commission on the average mix of resale properties in a competitive market. The same analysis and computation was performed for the listing side except that the commission rate used was 2.6485%, for the reasons described in note 40.

[34] Assuming that, in a competitive market, the prevailing commission structure would look like the one utilized by MAR in its attempts to compete with WREC, the listing agent would pay a 3% cooperative commission to the selling agent and would retain the balance of the commission (2.6485%) for itself.

74. As a result of the First Exclusive Agreement, WREC possessed market power, and, as a result of the Second Exclusive Agreement, RWRE/WRPP possesses market power, in the market for real estate services in Wintergreen Resort and in the larger market of Nelson County, Virginia -- both of which are relevant antitrust markets.

75. Both the First Exclusive Agreement and the Second Exclusive Agreement are unreasonable restraints of trade which have harmed competition in the relevant markets because of their substantial foreclosure effects which, in each case, have substantially exceeded 20%.

76. There are no offsetting procompetitive results.

77. Both the First Exclusive Agreement and the Second Exclusive Agreement violate and, as a result of the conduct set forth above, all Defendants have (together with unnamed Defendant WREC) violated, §1 of the Sherman Act, 15 U.S.C. §1.

78. As a result of the foregoing illegal conduct, MAR has suffered injury to its business and property.

## COUNT II
**(The Virginia Antitrust Act)**
**(Against All Defendants and Unnamed Defendant WREC)**

79. MAR realleges and incorporates by reference each and every allegation set forth above.

80. Both the First Exclusive Agreement and the Second Exclusive Agreement are agreements in restraint of trade and unreasonably restrain trade in the relevant markets.

81. As a result of the First Exclusive Agreement, WREC possessed market power and, as a result of the Second Exclusive Agreement, WRPP possesses market power in the market for real estate services in Wintergreen Resort and in the larger market of Nelson County, Virginia - both of which are relevant antitrust markets.

Case 3:07-cv-00016-NKM-BWC   Document 55   Filed 05/30/07   Page 31 of 36   Pageid#: 555

82. Both the First Exclusive Agreement and the Second Exclusive Agreement have harmed competition in the relevant markets because their substantial foreclosure effects which in, each case, have substantially exceeded 20%.

83. There are no offsetting procompetitive results.

84. As a result of the foregoing illegal conduct, MAR has suffered damage to its person or property.

85. The actions of the Defendants were willful or flagrant.

**COUNT III**
**(Common Law Conspiracy)**
**(Against All Defendants and Unnamed Defendant WREC)**

86. MAR realleges and incorporates by reference each and every allegation set forth above.

87. As set forth above, Defendants WPI, RWRE, Ashton, Williams and Kollmorgen, and Unnamed Defendant WREC, conspired together to violate the antitrust laws, to violate the Virginia Consumer Protection Act and otherwise to do what is wrongful and harmful to consumers, to competition and to MAR and to unjustly enrich WPI, WREC and WRPP.  As a result, these Defendants are liable for common law conspiracy.

**COUNT IV**
**(Violation of the Virginia Business Conspiracy Act)**
**(Against All Defendants and Unnamed Defendant WREC)**

88. MAR realleges and incorporates by reference each and every allegation set forth above.

89. As set forth above, Defendants WPI, RWRE, Ashton and Williams and Unnamed Defendant WREC combined, associated, agreed, mutually undertook or concerted together for the purpose of willfully and maliciously injuring MAR in its reputation, trade, business or

profession and MAR's reputation, trade or business has been damaged by such business conspiracy. As a result, those Defendants have violated VAC §18.2-499 and MAR has a civil cause of action against them for such damage pursuant to VAC §18.2-500.

**COUNT VI**
**(Virginia Consumer Protection Act)**
**(Against WPI)**

90. MAR realleges and incorporates by reference each and every allegation set forth above.

91. WPI is a supplier of resort services used primarily for personal or family purposes.

92. WPI committed fraudulent acts or practices in connection with its supply of resort services used primarily for personal or family purposes. In particular, WPI used deception, fraud, false pretense, false promise or misrepresentation in connection with its supply of such services by violating the antitrust laws, by conspiring to violate the antitrust laws, and by committing or participating in the commission of common law fraud, as set forth in detail above. WPI acted willfully and maliciously in connection with its violations of the statute.

93. Such actions by WPI violate Virginia Code §59.1-196 et seq.

**PRAYER FOR RELIEF**

WHEREFORE, MAR prays that this Court enter judgment:

A.      That MAR recover its actual and compensatory damages according to proof at trial;

B.      That MAR's damages be trebled in accordance with the antitrust laws of the United States and Virginia;

C.      That MAR be awarded pre- and post-judgment interest as permitted by law;

D.      That WPI, RWRE/WRPP and their agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and others acting in concert with any of them be

33

preliminarily and permanently enjoined from maintaining any exclusive agreement or course of dealing with regard to real estate services in Nelson County, Virginia, market or in Wintergreen Resort.

      E.      That MAR be awarded punitive damages without statutory limit;

      F.      That MAR be awarded its reasonable attorneys' fees and costs of suit as allowed by law; and

      G.      That the Court grant MAR such other and further relief as the Court may deem just and proper.

## JURY DEMAND

MAR demands a trial by jury as to all issues so triable.

Dated:  May 30, 2007                Respectfully submitted,

                                        GREENBERG TRAURIG LLP

                                        *Attorneys for Plaintiff Mountain Area Realty, Inc.*

                                         /s/ Geoffrey J. Greeves
                                        Geoffrey J. Greeves (VSB# 41499)
C. Allen Foster (admitted pro hac vice)
800 Connecticut Ave., N.W., Suite 500
Washington, DC  20006
Tel. 202/331-3183; Fax 202/261-0183
greevesg@gtlaw.com

Maria P. Logan (VSB# 47800)
1750 Tysons Blvd., Suite 1200
McLean, VA  22102
Tel. 703/749-1370; Fax 202/331-3101

OF COUNSEL:

Garret G. Rasmussen
ORRICK, HERRINGTON & SUTCLIFFE LLP
3050 K Street, N.W., Suite 200
Washington, DC  20007
202/339-8400

ERIK D. BOLOG (VSB# 33427)
6701 Democracy Blvd, Suite 515
Bethesda, MD 20817
240/542-1041

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2007, a true copy of the foregoing Amended Complaint was filed with the Clerk using the CM/ECF system which will send electronic notification of such filing to the following:

> Conrad M. Shumadine (VSB #4325)
> Michael R. Katchmark (VSB #40440)
> Brett A. Spain (VSB #44567)
> WILLCOX & SAVAGE, P.C.
> SUITE 1800
> ONE COMMERCIAL PLACE
> NORFOLK, VA 23510-2197

The following individual is not registered for electronic notification, therefore, a true copy of the foregoing Amended Complaint will be served upon him via First-Class, postage prepaid mail on May 30, 2007:

> Dewey B. Morris (VSB #5739)
> THOMPSON MCMULLAN, P.C.
> 100 SHOCKOE SLIP
> RICHMOND, VA 23219

/s/Geoffrey J. Greeves