# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| MOUNTAIN AREA REALTY, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:07cv00016 |
| | ) | |
| v. | ) | |
| | ) | (JURY TRIAL DEMANDED) |
| | ) | |
| WINTERGREEN PARTNERS, INC., | ) | |
| ROY WHEELER REALTY CO., dba | ) | |
| WINTERGREEN RESORT PREMIER | ) | |
| PROPERTIES and | ) | |
| ROBERT S. ASHTON | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

## INTRODUCTION

1.      Plaintiff Mountain Area Realty, Inc. ("MAR") brings this action under

federal and state antitrust laws against Defendants Wintergreen Partners, Inc. ("WPI"),

and Robert Ashton, the President and Chief Executive Officer of WPI, for entering into

two consecutive anticompetitive exclusive agreements.  The first anticompetitive

agreement was in effect from November 1999 to October 2005 and was with Wintergreen

Real Estate Company ("WREC") (the "WREC Exclusive Agreement").  The second is

with Roy Wheeler Realty Co. d/b/a Wintergreen Resort Premier Properties ("WRPP")

which commenced in August 2006 and is currently in effect ("the WRPP Exclusive

Agreement").  The two exclusive agreements ("the Exclusive Agreements") have harmed

competition by foreclosing competition, conveying substantial market power to a single

real estate company during the term of each agreement, and raising barriers to entry – all of which, both collectively and individually, have caused consumers to pay supracompetitive real estate commissions, supracompetitive rental fees, and supracompetitive WPI membership fees.

2.    The WRPP Exclusive Agreement, like the WREC Exclusive Agreement before it, grants WRPP the exclusive right to have a real estate sales office within the Wintergreen Resort in Nelson County, Virginia (the "Resort").  WRPP's exclusive office is located at Mountain Inn, which is the gateway to all the ski slopes, shops, conference facilities, rental properties and restaurants of the Resort.  Visitors who pass through Mountain Inn are the principal and most effective sales "leads" (i.e. potential buyers) for Resort properties.  Approximately 100,000 to 190,000 non-property owning visitors use the Resort each year (depending on the quality of the ski season).  All amenities and facilities at the Resort are, and always have been, open to the public.  A WRPP agent has described the exclusive office at Mountain Inn as the "honey hole" for obtaining buyers for Resort properties.  Competing real estate companies seeking to do business at the Resort are at a severe competitive disadvantage in finding buyers for residential Resort properties absent an office at Mountain Inn.

3.    The anticompetitive effects of the Exclusive Agreements are readily apparent from the shifts in market share that have resulted from the agreements.  WREC's market share of residential sales at the Resort reached a high of 82% during the term of the WREC Exclusive Agreement and averaged more than 70% during the last five years of the Agreement.  Since the Agreement expired, its share has fallen to 33% and it is continuing to decline.  In turn, WRPP's market share has jumped from 2% to 25% (based

on July 31, 2007 Multiple Listing Service data) as a result of the WRPP Exclusive Agreement, and it is increasing as new listings ripen into sales.

4.     Property owners have been harmed by the anticompetitive effects because they have had to pay higher commission rates and have received reduced services.  This has caused numerous Resort-property owners to sign a petition opposing the WRPP Exclusive Agreement.

5.     WPI has ignored these property owners because of what economists call "agency effects."  In other words, the agent (Defendant Ashton) puts its own interest ahead of the principal (the property owners).  Here, WPI's professional managers, in particular Defendant Ashton, benefit from the new WPI memberships that the exclusive agreements generate even though home owners at the Resort are injured.  Significantly, part of the consideration for the Exclusive Agreements has been a promise by the exclusive real estate company to push WPI memberships on new home purchasers at supracompetitive rates.

6.     MAR has suffered substantial lost profits as a result of the unlawful Exclusive Agreements entered into by Defendant WPI.  MAR's damages include lost commissions, lost rental fees, and higher costs.  Indeed, it was only during the interim period between the WREC and WRPP Exclusive Agreements (*i.e.,* October 2005 to August 2006) that MAR was able to even modestly increase its already limited market share at the Resort.  After the WRPP Exclusive Agreement went into effect in August 2006, MAR's market share in the Resort once again fell to the level it was at during the WREC contract even though MAR provides better services and charges lower commissions than WRPP.  MAR currently is experiencing losses at the Resort and is reducing its staff.

7.    Of the four other firms other than WREC and WRPP that have provided real estate services in the Resort, three have closed (or are in the process of closing) their offices because they could not overcome the anticompetitive foreclosure effects of the exclusive agreements.  MAR is at risk of doing the same.

8.    At no time has WPI articulated any justification, much less a procompetitive justification, for the exclusive agreements that cannot be achieved in a far less restrictive manner.  If WPI genuinely believes that the ambience of the Resort can be protected only by restricting the number of offices in the Resort, there are many other ways that can be accomplished without conferring monopoly power on one real estate company.

9.    Defendant WPI is liable for the damage that MAR suffered as a result of the two Exclusive Agreements.  In addition, MAR brings this action against WRPP, seeking injunctive relief and damages.  MAR has not sued WREC because it is no longer engaged in anticompetitive conduct, and it has acknowledged the anticompetitive effect of the exclusive contract to which it was a party between November 1999 and October 2005.

## JURISDICTION AND VENUE

10.    MAR's complaint arises under the antitrust laws of the United States, 15 U.S.C. §§ 1, 2, 15, 26, and the law of Virginia.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367 and 15 U.S.C. §§ 1, 2, 15, and 26.

11.    Venue is proper pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d).

12.    Defendants transact business in interstate commerce and are found within this judicial district.  MAR's claims arise in part within this District, and Defendants'

unlawful conduct has harmed commerce in this District. The interstate trade and commerce described herein are and have been carried out in part within this district.

**PARTIES**

13.     Plaintiff MAR is a Virginia corporation with its principal place of business at 2788-B Rockfish Valley Highway, Nellysford, Nelson County, Virginia 22958. MAR provides real estate services, including resale services for homes, condominiums, lots and raw land, in Nelson County, Virginia, and in the Resort. It has been in business for more than ten years, and it enjoys an excellent reputation.

14.     Defendant WPI is a non-stock Virginia corporation with its principal place of business at Mountain Inn, Devil's Knob, Wintergreen Resort, Virginia 22958. WPI owns and operates all of the resort, recreational, retail, conference and restaurant facilities at the Resort, which is located in Nelson County, Virginia. The Resort comprises approximately 11,000 acres and offers skiing, golf, and tennis. There are more than 3,000 homes in the Resort. There are no resorts comparable to the Wintergreen Resort within Nelson County or indeed, within convenient driving distance of Richmond, Virginia.

15.     Defendant WRPP is a Virginia corporation with its principal place of business at 1100 Dryden Lane, Charlottesville, Virginia 22903.

16.     Defendant Ashton is a citizen and resident of Wintergreen Resort, Nelson County, Virginia, and is, and has been during all material times, the President and Chief Executive Officer of WPI. Mr. Ashton was and is the ultimate controlling actor who designed, negotiated and executed the WRPP and WREC Exclusive Agreements. He personally benefited from the Exclusive Agreements because they caused WPI to earn supracompetitive membership fees.

## FACTS

### The WREC Exclusive Agreement

17.     On November 28, 1999, WPI entered into the WREC Exclusive

Agreement.  Pursuant to that Agreement, WPI granted WREC the exclusive right to have

a real estate office in the Resort at Mountain Inn for a term that expired on October 31,

2005.  WPI also agreed to prohibit any other real estate firm from leasing sales-office

space in the Resort.  In return, WREC promised to generate for WPI at least $400,000

worth of memberships in WPI per year.

18.     As the result of the Exclusive Agreement, WREC's market share at the

resort jumped to 58% in 2000 and increased to 82% by 2003.  During the last five years

of exclusivity (2001-2005), WREC's market share of residential sales  at the Resort

averaged 70%.  After the expiration of the WREC Exclusive Agreement, WREC's market

share dropped to 33% and it is trending downward.  Similarly, WREC's market share of

residential sales in Nelson County dropped from an average of approximately 46% during

the last five years of exclusivity to 24%.  WREC's market shares by year are set forth

below:

| Year | WREC's Market Share of Residential Resales in the Resort | WREC's Market Share of Residential Resales in Nelson County Excluding the Resort | WREC's Market Share of Residential Resales in Nelson County Including the Resort |
|------|------|------|------|
| 2000 | 58% | 17% | 36% |
| 2001 | 73% | 18% | 46% |
| 2002 | 80% | 22% | 47% |
| 2003 | 82% | 40% | 54% |
| 2004 | 55% | 24% | 41% |
| 2005 | 61% | 18% | 43% |
| 2006 | 45% | 10% | 30% |
| 2007 | 33% | 16% | 24% |

19.     The difference between WREC's average market share in the last five years of its Exclusive Agreement (which is the relevant time period because the first year understates the foreclosure effect because of the initial lag effect as the pipeline of buyers fills) and WREC's current market share equals the minimum foreclosure. That minimum foreclosure is 37% in the Resort (70% -33%) and 22% (46%-24%) in Nelson County as a whole. The true foreclosure is almost certainly much higher because WREC did not use the Multiple Listing Service (which is the source of the data) for all its sales during the term of the Exclusive Agreement, thus understating its market share at that time). Moreover, WREC continues to enjoy holdover benefits from its past Exclusive Agreement as its pipeline gradually dissipates.

20.     A comparison between WREC's share of the sales in the Resort compared to its sales in Nelson County outside the Resort during the last five years of the Agreement indicates that the minimum foreclosure rate of the Exclusive Agreement was at least 46% (70%-24%). WREC's higher market shares and higher prices in the Resort would not have been possible but for the foreclosure effects on competition caused by the WREC Exclusive Agreement.

21.     The WREC Exclusive Agreement gave WREC the power to charge supracompetitive commissions and exclude rivals – thereby exercising market power – as demonstrated by the following incident. When WREC's largest customer requested reduced commissions based upon volume, WREC summarily rejected that request and the customer was specifically told to go elsewhere if it disagreed with WREC's commission rates. WREC knew that the customer could not go elsewhere, and the customer did not go elsewhere notwithstanding the fact that WREC's commission rates

were 20% higher than the competitive rates.  In sum, the WREC Exclusive Agreement conferred market power on WREC.

### The WRPP Exclusive Agreement

22.     On August 31, 2006, WPI and WRPP entered into the WRPP Exclusive Agreement.  The WRPP Exclusive Agreement is even more restrictive than the WREC Exclusive Agreement and thus has a greater foreclosure effect.  In addition to giving WRPP the exclusive right to operate an office on Resort property, it also grants WRPP the exclusive right to display marketing materials on Resort property and to appear on the Resort's website.  In return, upon information and belief, WRPP has agreed to push the sale of memberships in WPI at supracompetitive price levels, which WRPP has been doing.

23.     WPI was so confident that the WRPP Exclusive Agreement would confer market power and foreclose rivals that WPI was willing to contract with WRPP, a local Charlottesville realtor that had no office in Nelson County, and that lacked the resources, knowledge, quality and efficiency necessary to serve the Resort market.

24.     In accordance with the WRPP Exclusive Agreement, WPI has aggressively promoted WRPP as the Resort's exclusive real estate company.  The Resort's web site says "the resort's resources will be focused on our official on-site real estate firm, Wintergreen Resort Premier Properties [WRPP]."  In press releases, letters and advertisements, WRPP is presented as the Resort's only "official on-site real estate firm," thus providing the "advantages of being *on the inside*" (emphasis in the original) which, according to WPI, "will work for you [because], as the only real estate firm with a physical presence on WPI's resort property, your property will receive enhanced exposure to hundreds of thousands of resort guests and visitors to our website."

25.     After securing the exclusive right to operate a real estate office at the Resort, WRPP's market share at the Resort has increased from less than 2% to 25%, and it is accelerating upward.  The dramatic rise in WRPP's market shares would not have occurred but for the virtual monopoly on the attention of the best source of prospective buyers afforded by the WRPP Exclusive Agreement.  Moreover, as the WREC experience demonstrates, WRPP's market share at the Resort will be much higher in the second full year of the Exclusive Agreement (2008) than the first (2007).

26.     The full foreclosure effect of the WRPP Exclusive Agreement has yet to be fully reflected in WRPP's market share because of  (i) the initial lag time between obtaining listings, filling its pipeline, and making sales, (ii) the depressed real estate market, and (iii) the decay rate of the relationships that WREC established with home owners during the term of its Exclusive Agreement.

27.     The Exclusive Agreement has conferred market power on WRPP by giving it a virtual monopoly over the best leads for buying properties.  Once those leads become buyers, WRPP's share of residential sales at the Resort and in Nelson County as a whole will reach levels comparable to those that WREC reached during the term of its Exclusive Agreement.  Indeed, WREC has recognized the anticompetitive effect of the current WRPP Exclusive Agreement in a mailing to the property-owners where it stated that "[t]here is no doubt that [the exclusive contract between WPI and WRPP] will negatively affect *all* homeowners for the reasons stated in the attached [petition]**."**

28.     Upon information and belief, WRPP has also agreed with WPI not to compete against WPI in the rental market, allowing WPI to charge supracompetitive membership fees.

## The Relevant Markets

29.     The relevant antitrust markets are the market for real estate broker services in Nelson County and the market or submarket for the Resort (the "Relevant Markets").

30.     The Resort is the only resort of its kind in Nelson County. Unlike shopping stations or gas stations, there are not multiple resorts in Nelson County that real estate brokers can serve.

31.     Real estate transactions at the Resort constitute a substantial portion of real estate transactions in Nelson County and likely constitute a separate product market.

## Harm to Competition

32.     WPI's successive Exclusive Agreements with WREC and WRPP have unreasonably restrained trade in the Relevant Markets in the following respects:

    a.  Substantially foreclosing other real estate companies from the Relevant Markets, and thereby harming the competitive process and depriving consumers of the benefits of a free market for real estate services.

    b.  Conveying market power on one real estate company, allowing that company (i) to overcharge consumers by charging supracompetitive commissions for Resort property (ii) to generate supracompetitive membership fees for WPI and (iii) to reduce services to buyers and sellers of houses at the Resort – all of which harm the competitive process.

    c.  Subjecting home owners at the Resort who seek to rent their homes to supracompetitive charges by WPI.

    d.  Raising barriers to entry in the Relevant Markets.

### *Anticompetitive Foreclosure*

33.     At the expiration of the WREC Exclusive Agreement, WREC's share of residential property sales at the Resort plummeted by approximately 37%, and it is still falling. At the same time, as set forth above, WRPP's market share rose sharply when it

became the exclusive real estate company at the Resort. These divergent market share shifts (even over this short time period ) demonstrate that the Exclusive Agreements have significant foreclosure effects, exceeding 37%, which is the decrease in WREC's market share that has occurred to date since the expiration of its Exclusive Agreement.

34.     Discovery is likely to show that the actual foreclosure caused by the exclusive agreements is significantly higher than 40% because the foreclosure effect of the Exclusive Agreements approaches 100% for visitors seeking to buy a home at the Resort because no other firm is allowed to have an office at the Resort. Indeed, a comparison of WREC's average market share in the Resort (70.2%) with its average market share in Nelson County outside the Resort (24%) during the last five years of the Exclusive Agreement supports an overall foreclosure rate of more than 46%.

35.     The Exclusive Agreements have significant foreclosure effects in the Relevant Markets, because to use WPI's words, they give the exclusive real estate company "first dibs" on potential buyers of Resort properties. The vast majority of buyers are visitors to the Resort and they do business with the real estate company whose office they see as they pass through Mountain Inn. As a matter of economic reality the vast majority of visitors, *i.e.* potential buyers, do business with the exclusive firm because of its office location at the Resort. Thus, as a practical matter, as evidenced by the large market share shifts, the Exclusive Agreements have a significant foreclosure effect.

*Creation of Market Power Resulting in Supracompetitive Commissions*

36.     Apart from the foreclosure effects, the Exclusive Agreements have unreasonably restrained trade by conveying significant market power, if not monopoly power, on the exclusive real estate company. Market Power means power over price, which in this case means commission rates. The Exclusive Agreements have given the

exclusive real estate company power over price in the Resort as evidenced by the supracompetitive commission rates that WREC and WRPP have charged during the term of their exclusive agreements.

37.     As a result of the market power created by the Exclusive Agreements, the exclusive real estate company has been able to charge commissions rates of 6%-7% for homes at the Resort instead of 5%-5.5% (*i.e.* an overcharge of at least 20%) which is the competitive commission, as evidenced by MAR's commission rate.  Similarly, the exclusive real estate company has been able to charge commissions of 10% for land at the Resort instead of the 6%-8% (which is an overcharge of at least 40%) which is the competitive rate as evidenced by MAR's commission rate.

38.     The supracompetitive commission rates have resulted in a consumer overcharge of  more than $2.5 million.  The total sales by WREC during the term of the illegal Exclusive Agreement to the was approximately $352,825,087.  The average commission charged by WREC was  6.3960%, compared to the average commission of 5.6485% in a competitive market.[1]  The difference is $2,637,367.  When data becomes available from WRPP, the amount of the overcharge will increase significantly.

39.     Home sellers are forced to pay these commissions to the exclusive real estate company because the exclusive real estate company has "first dibs" on potential buyers which means that it forecloses the vast majority of potential buyers from competitors.  (In some cases, the higher commissions may in part be passed on to buyers through higher prices, which harms buyers as well.)

---

[1]     It is notable that, when WREC charged a 7% commission rate on its listings, it gave cooperating brokers who actually produced the sale for the property only 3%, keeping 4% for itself.  Similarly, when MAR offered competitive listing commissions of 5 ½%, it was forced to give a full 3% to the selling broker, keeping only 2 ½% for itself.  Thus, the foregoing computation of WREC's overcharges is

*Supracompetitive Membership Fees*

40.     The monopoly power conveyed by the Exclusive Agreements allows the exclusive real estate company to foist WPI memberships on buyers of property.  This also harms competition and thus unreasonably restrains trade in violation of Sherman Act § 1.

41.     Upon information and belief, WPI membership prices are at supracompetitive levels.  If there were competition among real estate agents, house buyers would more likely learn the true value of WPI memberships and, upon information and belief, fewer buyers would join.

42.     Since the advent of the WREC Exclusive Agreement, WPI has consistently increased its membership fees without improving the benefits to members as set forth below:

| <u>Year</u> | **Property Right of Membership** | **Activation Fee** | **Annual Charge** | **Memberships Sold** |
|------|------|------|------|------|
| 2001 | $12,500 | $5,500[2] | $870 | $663,750 |
| 2002 | $12,500 | $14,000 | $2640 | $8,758,367[3] |
| 2003 | $12,500 | $15,000 | $2900 | $1,487,197 |
| 2004 | $13,000 | $16,000 | $3250 | $1,555,987 |
| 2005 | $13,500 | $17,000 | $3640 | $1,591,164 |

---

conservative because it relies upon average commission rates, not the actual, even larger, supracompetitive portion WREC arrogated to itself.

[2]     The initial offering price of $5,500 was good for two months, after which it escalated to $10,000.

[3]     WPI operates on an April 20 fiscal year ending.  As a result, the 2002 financial statements reflect the financial condition and results of operations for May 1, 2001 through April 30, 2002.  During that time, WPI instituted the "Premier Equity Membership" which is described in this lawsuit.  As a result, the 2002 financial statements reflect the very substantial cash infusion resulting from WPI members converting to Premier Equity memberships.

| 2006 | $14,000 | $17,000 | $4325 |

43.     The increasing rates in the face of declining demand demonstrate the supracompetitive nature of the membership fees and anticompetitive nature of the Exclusive Agreements.

*Higher Rental Rates*

44.     The Exclusive Agreements have also harmed competition by facilitating higher rental rates than would exist in a normal competitive market. WPI purposely arranged for only one exclusive realtor to be at the Resort so it could keep rental rates at supracompetitive levels.

45.     Having an office at the Resort is a prerequisite for a competitive rental market program, and by limiting the number of offices, WPI has precluded its competitors from feasibly offering rental services. An office at the Resort is essential in order to meet tenants or delivering keys to units within the Resort. [4]

46.     As mentioned above, upon information and belief, WREC and WRPP agreed tacitly, if not expressly, not to compete with WPI for rental fees during the terms of their respective Exclusive Agreements.

47.     WPI has charged supracompetitive rental commissions – 50% commission on the rental of Resort properties, while the competitive market commission is 25%. [5] In addition, WPI charges a $1,000 fee merely to participate in its monopoly rental program.

---

[4]     Any property in WPI's program must be retrofitted with electronic keys (at a cost of nearly $1000) that only WPI can validate and supply. Even when the owners of the property desire to occupy it, they must obtain keys through the WPI reception desk (including, ignominiously, having to sign a certificate of ownership). If an owner who is in WPI's program rents his property privately (which is allowed but strictly discouraged), he must call, reserve for his guest, and send the guest to the reception desk with a signed authorization from the owner. WPI refuses to give that guest any of the information package that is given to tenants in its program.

[5]     The 50% rate is for gross rentals. If the home owner provides the cleaning services, the commission is 30%.

48.     WPI also exacts supracompetitive prices for services connected to the rental program.  For example, WPI charges the unit owner supracompetitive fees to make repairs even though WPI also charges an annual maintenance charge of $300.  Similarly, WPI charges the home owner $36.00 per month for telephone service to each rental unit, even though that service is provided through its switchboard at no marginal cost.  Similarly, WPI charges $36.00 per month for cable TV service to each rental unit, a price which far exceeds its marginal cost.  Further, WPI forces every participant to provide high-speed DSL service to the unit and charges $19.95  per month, even though, on information and belief, it obtains the service in bulk for a fraction of the charge and despite the fact that few of the units even have the connections to allow use of the service.

49.     Owners frequently complain about all these aspects of the WPI program but, because it has monopoly power in the Rental Market as  a result of the Exclusive Agreements, WPI has no need to respond or change, and it has not.

**No Offsetting Procompetitive Justifications**

50.     There are no offsetting procompetitive justifications for the Exclusive Agreements.  All of the benefits claimed by WPI can be achieved in a less-restrictive manner.

51.     WPI has never explained how a single real estate firm could possibly offer "more exposure" for a seller's property than multiple firms competing within the Resort.  WPI has also never explained how visitors (*i.e.*, prospective buyers) benefit from a single firm that is insulated from price competition and that refuses to provide buyers with basic real estate services, such as open houses.

52.     More than 1,000 property owners have protested the anticompetitive effects caused by the WRPP Exclusive Agreement in a recent petition to WPI, which stated in part:

> We, the undersigned current property owners or potential property owners at Wintergreen Resort, express our great disappointment and dissatisfaction with the actions of the Board of Directors of Wintergreen Partners, Inc. in agreeing to have an exclusive real estate sales agency in Mountain Inn for Wintergreen properties (Wintergreen Resort Premier Properties, Inc.) [WRPP]. We believe that this restraint of competition harms sellers of Wintergreen properties by making it more difficult to sell, keeping properties on the market longer, reducing the quality of real estate services, increasing commissions that must be paid and reducing the net sales price realized. In addition, the restriction on competition hurts purchasers by reducing the number of agents with whom they may realistically work, makes their visiting available properties more difficult, subjects them to pressure to purchase WPI memberships which both increases the total price and thereby makes purchasers reduce their offers for the property itself and lessens the opportunities for (and increases the cost of) rentals of purchased properties.

### Plaintiff MAR's Injury

53.     In addition to harming the competitive process, the WPI Exclusive Agreements have crippled MAR by foreclosing it from the vast majority of potential buyer leads and depriving it of sales that it otherwise would have made.

54.     In addition, the Exclusive Agreements have imposed substantial costs on MAR depriving it of economies of scale. Among other things, MAR has been forced to incur substantially higher costs for advertising and marketing as a result of the exclusive contracts. Upon information and belief, MAR's expenditures on advertising and promotion for sale of resale properties have substantially exceeded those of WREC during the term of the WREC Exclusive Agreement even though WREC's market share was three times as large. MAR has also been forced to incur costs associated with paying

its agents larger commission payouts and bonuses to retain them because of the WREC and WRPP Exclusive Agreements.

55.     MAR's lower commission rates on Resort-property resales have been ineffective in the face of the Exclusive Agreements.  During the WREC Exclusive Agreement, for example, MAR's commissions were 5-5.5% on Resort homes and condominiums (compared to WREC's 6-7%) and 6-8% on Resort land (compared to WREC's 10%).  However, although MAR's rates were roughly 20% lower than WREC's rates, MAR was foreclosed from a substantial amount of Resort business due to WREC's exclusivity.

56.     But for the foreclosure effects attributable to the Exclusive Agreements, MAR would have had a substantially higher market share at the Resort given its experience, its superior services, and its competitive commission rates.

57.     MAR's superior services include extensive advertising in the market, a state-of-the-art website, preparation of color brochures and other promotional literature and extensive advertising which promoted the Resort and memberships in WPI.[6]  In contrast, WREC and WRPP never provided any of the foregoing services.

58.     Despite MAR's lower commissions and superior services, the following email reflects the foreclosure effects that MAR has suffered:

> "[A]lthough we LOVE working with you, we are listing our home with Wintergreen Real Estate [WREC].  We feel that a lot of people look at homes during a fun weekend of skiing without ever having planned to do so.  We feel these people are more likely to approach Wintergreen b/c they are on the top of the mountain and are probably referred to

---

[6]     MAR also engaged in internet advertising on its web site but such advertising has not been an effective countermeasure against the exclusive contracts because buyers are typically actual visitors to the Resort who explore purchase opportunities during their visit.

more by the Mountain Inn etc.  We are just trying to make the best decision to sell our home the fastest . . . ."[7]

## COUNT I

### (Sherman Act § 1)

59.     MAR realleges and incorporates by reference each and every allegation set forth above.

60.     By entering into the Exclusive Agreements, WPI and Defendant Ashton have unreasonably restrained trade in each of the Relevant Markets in violation of Sherman Act §1.

61.     As a result of the foregoing illegal conduct, MAR has suffered injury to its person or property as a result of the anticompetitive effects of the Exclusive Agreements. The lost commission revenue alone totals more than $5 million.

## COUNT II

### (The Virginia Antitrust Act)

62.     MAR realleges and incorporates by reference each and every allegation set forth above.

63.     By entering into the Exclusive Agreements, WPI and Defendant Ashton have unreasonably restrained trade in each of the Relevant Markets in violation of Va. Code Ann. § 59.1-9.5 et seq.

64.     As a result of the foregoing illegal conduct, MAR has suffered injury to its person or property as a result of the anticompetitive effects of the Exclusive Agreements. The lost commission revenue alone totals more than $5 million.

---

[7]     This email was written on February 9, 2006, after WREC lost its sales office in Mountain Inn but while it still had the exclusive right to be "on the mountain."

## COUNT III

### (Virginia Business Conspiracy Act)

65.     MAR realleges and incorporates by reference each and every allegation set forth above.

66.     As set forth above, Defendants WPI, WRPP and Ashton combined, associated, agreed, mutually undertook or concerted together for the purpose of willfully and maliciously injuring MAR in its reputation, trade, business or profession and MAR's reputation, trade or business has been damaged by such business conspiracy.  As a result, those Defendants have violated Va. Code Ann. §18.2-499 and MAR has a civil cause of action against them for such damage pursuant to Va. Code Ann. §18.2-500.


## PRAYER FOR RELIEF

WHEREFORE, MAR prays that this Court enter judgment:

A.     That MAR recover its actual and compensatory damages according to proof at trial;

B.     That MAR's damages be trebled in accordance with the antitrust laws of the United States and Virginia;

C.     That MAR be awarded pre- and post-judgment interest as permitted by law;

D.     That WPI and its agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and others acting in concert with any of them be preliminarily and permanently enjoined from maintaining any exclusive agreement or course of dealing with regard to real estate services in Wintergreen Resort.

E.    That WRPP and its agents, servants, employees, affiliates, divisions,

branches, subsidiaries, parents and others acting in concert with any of

them be preliminarily and permanently enjoined from maintaining any

exclusive agreement or course of dealing with regard to real estate

services in Wintergreen Resort.

F.    That MAR be awarded its reasonable attorneys' fees and costs of suit as

allowed by law; and

G.    That the Court grant MAR such other and further relief as the Court may

deem just and proper.

## JURY DEMAND

MAR demands a trial by jury as to all issues so triable.

Respectfully submitted,

MOUNTAIN AREA REALTY, INC.,

by counsel.

**s/Neal L. Walters**
Neal L. Walters, Esq.
Virginia State Bar No. 32048
Attorney for Plaintiff
Scott │ Kroner PLC
418 East Water Street
P.O. Box 2737
Charlottesville, VA 22902
Telephone: (434) 296-2161
Fax: (434) 293-2073
E-mail: nwalters@scottkroner.com

OF COUNSEL:

Garret G. Rasmussen, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
3050 K Street, N.W., Suite 200
Washington, DC  20007
202/339-8400

OHS East:160285775.1
18481-2 CM0/CM0

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Conrad M. Shumadine, Esq. Counsel for Defendants, and Peter J. Barrett, Esq., Counsel for WREC, and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: N/A.

**s/Neal L. Walters**
Neal L. Walters, Esq.
Attorney for Plaintiff
Scott │ Kroner PLC
418 East Water Street
P.O. Box 2737
Charlottesville, VA 22902
Telephone: (434) 296-2161
Fax: (434) 293-2073
E-mail: nwalters@scottkroner.com